2025 Tex. Bus. 9



The Business Court of Texas,
1st Division

| | | |
|---|---|---|
| PRIMEXX ENERGY OPPORTUNITY FUND, LP and PRIMEXX ENERGY OPPORTUNITY FUND II, LP, *Plaintiffs*, <br><br> v. <br><br> PRIMEXX ENERGY CORPORATION, M. CHRISTOPHER DOYLE, ANGELO ACCONCIA, BLACKSTONE INC., BLACKSTONE HOLDINGS III LP, BLACKSTONE EMA II LLC, BMA VII LLC, BLACKSTONE ENERGY MANAGEMENT ASSOCIATES II LLC, BLACKSTONE ENERGY PARTNERS II LP, BLACKSTONE MANAGEMENT ASSOCIATES VII LLC, BLACKSTONE CAPITAL PARTNERS VII LP, BCP VII/BEP II HOLDINGS MANAGER LLS, BX PRIMEXX | § § § § § § § § § § § § § § § § § § § § § § § § | Cause No. 24-BC01B-0010 |

TOPCO LLC, and BPP HOLDCO                §
LLC, *Defendants*                        §

═══════════════════════════════════════════════

**OPINION AND ORDER**

═══════════════════════════════════════════════

## *Syllabus*[*]

*This opinion addresses the nature, scope, adaptability, and enforcement of a partner's statutory duties of loyalty and care and obligation to perform them in (i) good faith and (ii) a manner it reasonably believes to be in the partnership's best interest when that partner exercised its drag-along rights and sold the partnership's business.*

*Texas's freedom of contract principles give partners wide latitude to expand or limit their conduct standards. But the loyalty and care duties and related performance obligations cannot be eliminated. This partnership agreement expressly limits those duties and obligations to the greatest extent permitted by law. This case centers on the enforceability of those limits.*

### I. OPINION

[¶ 1] This is a drag-along sale case arising from a private equity investment in a limited partnership. The controlling partner exercised its partnership agreement drag-along sale rights to force an exit event sale, and two minority owners complain that the sale was unlawful.

[¶ 2] Drag-along rights are a normal vehicle for majority owners to force minority owners—potentially against their will—to sell their interests to a

---

[*] This syllabus is provided for the reader's convenience; it is not part of the Court's opinion; and it is not legal authority.

third party on terms and conditions the majority owner decides. So, there may be conflicts between the owners when the majority decides to sell at a price or on terms the minority dislikes. The issues can be more acute where the parties hold different equity positions. Thus, parties creating such agreements often negotiate terms protecting themselves in a future drag-along sale.

[¶ 3] Two limited partners sued the controlling partner and managing general partner alleging that they breached "fiduciary" and contract duties and obligations by, among other things, (i) accepting too low a price; (ii) failing to perform adequate due diligence, consider continuing the business as a viable stand-alone business or other alternatives, consider whether the sale was fair to the partnership and other partners; and (iii) not giving timely notice of the sale. They also sued the managing partner's chief executive for conspiracy and other "derivative theory" causes of action.[1]

[¶ 4] Those defendants moved for traditional summary judgment.[2] The material facts are undisputed, and the result turns on the extent to which (i)

---

[1] Plaintiffs sued numerous other parties, but they are not included in this summary judgment motion.

[2] Movants' attacked plaintiffs' original petition, which was their then live pleading. Plaintiffs since filed their first amended petition (FAP), which adds an additional defendant but no new causes of action. The parties agreed that the FAP would not moot the summary judgment motion. So, this opinion and order is directed to the FAP.

the Texas Business Organizations Code (TBOC) displaces common law partnership fiduciary duty law and (ii) partners may limit a partner's "fiduciary like" responsibilities to the partnership and other partners.

[¶ 5] The court denies the motion regarding plaintiffs' claims that the sales proceeds (i) were misapplied under the partnership agreement and (ii) were unfairly allocated between the partnership and a "sidecar" business sold in the same transaction.

[¶ 6] However, based on the partnership agreement's plain text, the court otherwise concludes that the controlling partner's drag-along rights meet minimum statutory requirements. Further, except as described in ¶ 5, the evidence conclusively proves that the controlling partner and the managing general partner met their modified statutory and contract duties and obligations.

[¶ 7] Additionally, for the reasons discussed in ¶ 6, the court grants the motion regarding "derivative liability" theories regarding the managing partner and its chief executive to the same extent the court grants the controlling partner's motion.

[¶ 8] Moreover, the court directs the parties to provide additional briefing regarding plaintiffs' remaining derivative liability theories.

[¶ 9] The summary judgment motion concerns only the duty and breach elements of plaintiffs' causes of action. Thus, the court expresses no opinion regarding plaintiffs' injury causation and resulting damages elements.

## II. JURISDICTION AND VENUE

[¶ 10] This court has subject matter jurisdiction since this is a partnership governance dispute and the amount in controversy exceeds $5 million. TEX. GOV'T CODE § 25A.004(b)(2) and (4)–(6).

## III. THE SUMMARY JUDGMENT RECORD

[¶ 11] The court considered the parties' summary judgment filings and proper summary judgment evidence. It did not consider evidence movants filed with their prior supplemental briefing because they did not seek leave to supplement the record and plaintiffs in substance objected to that evidence. Neither party objected to any other summary judgment evidence.

## IV. FACTS AND PEOFs' CLAIMS

[¶ 12] The court derives these facts from the parties' summary judgment evidence and PEOFs' FAP admissions.

## A. The Parties and Related Entities

[¶ 13] Primexx Energy Partners, Ltd. (PEP) was a limited partnership.[3] Its Third Amended and Restated Partnership Agreement (TAPA) is the applicable agreement.[4] PEP owned Primexx Resource Development, LLC (PRD).[5] PEP and PRD are not parties.

[¶ 14] Primexx Energy Opportunity Fund LP (PEOF I) and Primexx Energy Opportunity Fund II (PEOF II) were PEP limited partners.[6] PEOF I signed the TAPA through its representative Whittier Management GP LLC, by Steven A. Anderson as the Vice President of Whittier Holdings, Inc.[7]

[¶ 15] BPP HoldCo LLC (HoldCo or Blackstone) was a PEP limited partner.[8] HoldCo is a Blackstone Inc. affiliate.[9]

---

[3] FAP ¶ 1.
[4] FAP ¶ 1; Movants' Ex. 2 (TAPA).
[5] FAP ¶ 1.
[6] FAP ¶s 42, 55.
[7] TAPA at 73.
[8] Movants' Ex. 1 (PIPA); FAP ¶ 1.
[9] FAP ¶ 20.

[¶ 16]   Primexx Energy Corporation (PEC) was PEP's managing general partner.[10]   PEC was formed in September 2000, and in 2021 was governed by its July 2016, Second Amended and Restated Bylaws (Bylaws).[11]

[¶ 17]   A nine-member board of directors controlled PEC.[12]   HoldCo appointed five such directors, PEOF I appointed two, and Tom Fagadau appointed two.[13]   Thus, at all relevant times HoldCo controlled PEC's Board.[14]

[¶ 18]   Angelo Acconcia and four others were HoldCo's initial-appointed directors.[15]   Jim Jeffs and Robert Holland were PEOF I's appointed directors, and Tom and Chip Fagadau were Fagadau's appointed directors.[16]

[¶ 19]   Under the Bylaws, Tom Fagadau was PEC's President and Chief Executive Officer.[17]   However, as of August 2, 2021, Christopher Doyle held those positions.[18]

---

[10] FAP ¶s 1, 42.

[11] Movants' Ex. 10 (Bylaws).

[12] FAP ¶ 82.

[13] Bylaws at Art. III, § 2; Schedule I.  The Bylaws do not define "Blackstone," however, context shows that it means HoldCo.  Both the TAPA and the PIPA, entered contemporaneously with the Bylaws, define "Blackstone" to mean HoldCo. (TAPA at 1; PIPA at 1).  Furthermore, the Bylaws were signed by HoldCo. (Bylaws at 21).

[14] FAP ¶ 53.

[15] Movants' Ex. 10 (Bylaws) at Schedule I.

[16] Movants' Ex. 10 (Bylaws) at Schedule I.

[17] Movants' Ex. 10 (Bylaws) at Schedule II.

[18] FAP ¶ 33; Movants' Ex. 3 (Aug. 2, 2021, Board Minutes).

[¶ 20] PEOFs sued Doyle, PEC, HoldCo, Blackstone Inc., various Blackstone Inc. affiliates[19], and Angelo Acconcia.  Acconcia, Blackstone Inc., and the Blackstone Inc. affiliates did not join this motion.

## B.   PEP's Background

[¶ 21] PEP's operating company, PRD, developed horizontal drilling properties in the Permian Basin.[20]

[¶ 22]  In 2016, PEP engaged firms to identify opportunities for reducing its debt and raising capital.[21]  After considering several proposals and multiple financing options, PEP chose "The Blackstone Group's" offer as the most attractive based on its valuation, capital commitment, and reputation.[22]

[¶ 23] Before signing the TAPA, "Blackstone," certain members of PEP's management team, and PEP's existing equity holders created a term sheet outlining expected terms for "Blackstone's" potential investment.[23]  Per the term sheet, they expected a transaction whereby (i) "Blackstone" would

---

[19] FAP ¶ 20 ("All of the other Blackstone Defendants are direct subsidiaries of Blackstone Inc.").

[20] FAP ¶s 1, 37.

[21] FAP ¶ 40.

[22] FAP ¶ 41.  In 2021, The Blackstone Group changed its name to Blackstone Inc.  *Id.*

[23] FAP ¶ 48; TAPA at Annex B.  The court uses "Blackstone" throughout this opinion where PEOFs are unclear regarding which Blackstone entity or related person they refer to.

invest up to $500 million; (ii) "Blackstone" would control a management company with five of nine board members; (iii) with three exceptions not relevant here, all "Board matters" would be decided by a majority vote; (iv) "Blackstone" could at any time force an in-kind distribution of all Company assets in a "Liquidity Event" in accordance with an agreed distributions waterfall; and (v) "Blackstone" would have "customary drag-along rights" regarding a potential sale of the partnership Units.[24]

[¶ 24] HoldCo and PEP signed a fifty-four-page Partnership Interest Purchase Agreement (PIPA) stating terms whereby HoldCo would invest in PEP.[25]

[¶ 25] HoldCo signed the TAPA as a limited partner (Unitholder).[26] PEC remained PEP's Managing General Partner[27] and, at some point, contributed $1,000 as a Managing General Partner Capital Contribution.[28]

---

[24] FAP ¶ 48; TAPA at Annex B. The term sheet and other documents do not say which "Blackstone" entities would provide the new equity or how "Blackstone" would internally structure its investment.

[25] PIPA; *see also* TAPA at 1.

[26] FAP ¶ 42; TAPA at 1, 83.

[27] FAP ¶ 42.

[28] TAPA § 3.2.

## C. Partners' Duties to the Partnership and other Partners

[¶ 26] Per the TAPA, HoldCo and PEC owe PEP and its partners the duty of good faith and fair dealing to the fullest extent Texas law requires:

> Each Partner and the Managing General Partner shall, to the fullest extent required by Texas Law, owe to the Partnership and its Partners the duties of good faith and fair dealing, and in the case of the Managing General Partner, the duty to not exceed in such capacity the bounds of authority granted to any general partner by this Agreement and Texas law (all such duties collectively, the "Agreed Duties").[29]

[¶ 27] But the TAPA then limits—to the extent the law permits—HoldCo's and PEC's duties to the partnership and other partners, including giving HoldCo and PEC the right to make partnership decisions in their sole and absolute discretion and in their own sole interests.[30] For example,

> (ii) To the extent that, at law or in equity, a Partner owes any duties (including fiduciary duties) to the Partnership, any other Partner or any Assignee pursuant to the applicable law, any such duty, other than the Agreed Duties, is hereby eliminated to the fullest extent permitted pursuant to applicable law, it being the intent of the Partners that to the extent permitted by law and except to the extent set forth in this Section 5.9 or expressly specified elsewhere in this Agreement, no Partner or the Managing General Partner, in their capacities as such, shall owe any duties of any nature whatsoever to the Partnership, the other Partners or any Assignee, other than the Agreed Duties, and each Partner, in its capacity as such, may decide or

---

[29] TAPA § 5.9(a) (emphasis original).
[30] TAPA §§ 5.9(b)–(c).

determine any matter in its sole and absolute discretion taking into account solely its interests and those of its Affiliates *(excluding the Partnership and its Subsidiaries)* subject to the Agreed Duties. Each Partner further acknowledges and agrees that it would not have become a Partner in the Partnership if this agreement were not acceptable to it.[31]

## D.   HoldCo's Drag-Along Sale Rights

[¶ 28] Next, TAPA Article VI describes the Unitholders' rights, duties, and obligations.[32]   In particular, § 6.7 gives HoldCo "drag-along" rights authorizing it to negotiate and ultimately force the other Unitholders to consummate a sale of PEP's business to a third party—provided the sale results from an arm's-length transaction after July 12, 2018.[33]   That section also provides for distributing the resulting proceeds pursuant to a TAPA waterfall.[34]

## E.   PEOF II and BPP Sidecar

[¶ 29] PEOF II soon became a PEP Unitholder.[35]

---

[31] TAPA § 5.9(c)(ii) (emphasis added).  The emphasized parenthetical shows that even if the partnership itself could be considered an affiliate of a partner, the partner is still free to disregard the interests of the partnership.  So, the TAPA establishes that partners may put their interests above the partnership, to the extent allowed by applicable law.

[32] TAPA at Art. VI.

[33]  TAPA § 6.7(a); *see What Is an Arm's Length Transaction*, Investopedia, https://www.investopedia.com/terms/a/armslength.asp (last visited March 5, 2025).

[34] TAPA § 6.7(b).

[35] FAP ¶ 55.

[¶ 30]  "Blackstone" later created a "sidecar vehicle," BPP Acquisition LLC (BPP), to buy additional acreage in PEP's acreage footprint.[36]

## F.  The Callon Sale

[¶ 31]  PEP's valuations improved in 2020 and 2021.[37]  By June 2021, PEOFs' stakes were worth more than $200 million.[38]

[¶ 32]  In early Spring 2021, Jim Jeffs learned that PEC's management, led by Doyle, was exploring a potential sale.[39]  At that time, Jeffs was a PEC board member and received updates from PEC "management" and the "Blackstone" board members about the sale process.[40]

[¶ 33]  In early May, Callon Petroleum made an initial offer of interest to purchase PEP and BPP for $375 million and 8.5 million Callon shares.[41]  Three weeks later, it increased the cash portion to $425 million.[42]

---

[36] FAP ¶ 58.  *See* Sidecar, Investopedia, https://www.investopedia.com/terms/s/sidecar-investment.asp (last visited March 5, 2025).

[37] *See* FAP ¶s 62–64.

[38] FAP ¶ 64.

[39] PEOFs' Ex. 3 (Jeffs Dec.) ¶ 3.

[40] Jeffs Dec. ¶ 3.

[41] FAP ¶ 69.

[42] FAP ¶ 69.

[¶ 34]  On June third, Doyle emailed PEC's Board (including Jeffs) that Callon's enhanced offer was not nearly as compelling as continuing to operate as a stand-alone entity.[43]

[¶ 35]  It was reported during a PEC Board meeting a week later that (i) PRD's and BPP's balance sheets had strengthened over the past six months and remained healthy, (ii) they met forecast expectations through the first-quarter 2021, and (iii) the efficient execution and capital acceleration with a second rig expected to grow the companies meaningfully.[44]

[¶ 36]  Throughout June and July 2021, Doyle told PEC's Board that he continued speaking with Callon, but it was unable to close the gap and had not presented an attractive offer.[45]  During that same period, Callon increased its offer to $440 million cash and 9.2 million shares; however, its share price also decreased so the actual offer remained unimproved.[46]

[¶ 37]  On July twenty-eighth, Jeffs and Doyle discussed the potential Callon deal.[47]  By then, Callon's stock price had decreased, making its offer

---

[43] FAP ¶ 69; Jeffs Dec. ¶ 5.
[44] FAP ¶ 70.
[45] FAP ¶ 74.
[46] FAP ¶ 75.
[47] Jeffs Dec. ¶ 6.

worth $50 million less than the prior month.[48]  Doyle told Jeffs that Callon's offer was "too low" to be taken seriously and that Callon needed to dramatically increase its offer before he would even consider it a realistic offer.[49]

[¶ 38] Then, "without any warning or explanation," on July thirtieth "Blackstone" told the Board that it had accepted Callon's offer at the same price Doyle two days earlier told Jeffs was too low to even consider.[50]

[¶ 39] Based on information Doyle and the "Blackstone" directors provided directly to Jeffs, he did not understand that a sale was close until Doyle formally announced the sale at the end of July.[51]

[¶ 40] Once Jeffs heard from "Blackstone" about the final sale terms, he spoke with Eric Derrington and Steve Anderson, PEOFs' representatives with Whittier Trust Company.[52]  They in no way suggested that PEOFs supported the deal and expressed their belief that it was hastily put together without sufficient opportunity to evaluate the sale.[53]

---

[48] Jeffs Dec. ¶ 6.
[49] Jeffs Dec. ¶ 6.
[50] Jeffs Dec. ¶ 7.
[51] Jeffs Dec. ¶ 4.
[52] Jeffs Dec. ¶ 9.
[53] Jeffs Dec. ¶ 9; PEOFs' Ex. 4 (Derrington Dec.) ¶s 7–9.

[¶ 41] PEC's board and BPP's board of managers met on August 2, 2021, and after discussion unanimously approved the Callon deal.[54] However, Tom Fagadau said he did not personally support the sale but was voting for it "only pursuant to drag-along obligations."[55] Steve Pully similarly voted for the sale, expressing the same sentiment."[56] No other PEC director, including Jeffs and Langdon, expressed that reservation.[57]

[¶ 42] The sale closed on October 1, 2021.[58]

[¶ 43] In a phone call around "the time of sale," a "Blackstone" executive told a "Primexx board member" that senior "Blackstone" executives directed the exit although "he" knew it was a bad deal.[59]

## G.    Summary of Claims

[¶ 44] According to PEOFs:

> 85. By forcing the Board to vote on (and approve) the proposed transaction over a weekend, Blackstone necessarily precluded the Managing General Partner or the Board from engaging in a reasoned and fully informed decision-making process or satisfying their contractual and fiduciary duties.    Yet all

---

[54] Movants' Ex. 3 (Aug. 2, 2021, Board Minutes).

[55] Movants' Ex. 3 (Aug. 2, 2021, Board Minutes) at 2.

[56] Movants' Ex. 3 (Aug. 2, 2021, Board Minutes) at 3.  Chip Fagadau approved the deal for BPP with the same reservation.  *Id.*

[57] Movants' Ex. 3 (Aug. 2, 2021, Board Minutes) at 2–3.

[58] FAP ¶ 94.

[59] FAP ¶ 76.

Blackstone-controlled Board Members voted to approve the sale without conducting any analysis or due diligence to fairly evaluate the transaction and whether it would be fair to all Primexx investors.

86. The final sale documents were executed on August 3, 2021.

\*\*\*

87. In the weeks and months leading up to the Callon transaction, Defendants did not hold regularly scheduled Board meetings to discuss and consider whether a sale transaction made sense from the point of view of the company and all of its unitholders, engage in any non-cursory review or analysis of the company's intrinsic fair value or future prospects, or retain experts to conduct thorough due diligence or review of the fairness of the forced sale.[60]

[¶ 45] PEOFs further allege that (i) "Blackstone" structured the sale terms, which included both PRD's assets and "Blackstone's" sidecar (BPP), so "Blackstone" was the only entity to receive any significant sale proceeds[61] and (ii) although PEOFs owned preferred shares, after the Callon sale closed, "Blackstone" paid compensation to common Unitholders, who were behind PEOFs in the payment waterfall.[62]

---

[60] FAP ¶s 85–87.
[61] FAP ¶s 96, 107.
[62] FAP ¶ 98.

## H.    Procedural History

[¶ 46] PEOFs sued defendants, except Acconcia, in a state district court.[63]  That court dismissed the case based on a forum-selection clause requiring the suit to be brought in federal court.[64]

[¶ 47]  PEOFs added Acconcia and refiled in federal court.[65]  That court *sua sponte* dismissed the case before any defendant appeared.[66]

[¶ 48]  PEOFs again sued in state court.[67]  Later, in May 2024, movants filed a traditional summary judgment motion challenging the breach element of PEOFs' causes of action and moved to stay discovery.

[¶ 49] In September 2024, PEOFs removed the case to this court.[68] Based on the parties' agreement, the court dismissed the case without prejudice.[69]  The parties filed a district court Rule 11 agreement providing that

---

[63] FAP ¶ 6.
[64] FAP ¶ 7.
[65] FAP ¶ 8.
[66] FAP ¶s 9–10; FAP Exs. 4, 5.
[67] FAP ¶ 11.
[68] FAP ¶ 12.
[69] FAP ¶ 12.

earlier discovery could be used here and outlining the parties' agreement regarding dispositive motions.[70] PEOFs then filed this action.[71]

[¶ 50] The court held arguments regarding movants' motion and requested supplemental briefing on certain issues. The parties responded with additional briefing and evidence. The court considered the briefing but did not consider the supplemental evidence because it was not properly submitted.

## V. APPLICABLE LAW

### A. Summary Judgment Standards

[¶ 51] At any time, a defendant may move with or without supporting evidence for a summary judgment as to all or any part of any causes of action asserted against it. TEX. R. CIV. P. 166a(b). The motion must state its specific grounds. *Id.* at 166a(c).

[¶ 52] Thereafter, the court *shall* render judgment if the pleadings, summary judgment filings, and properly filed evidence show that, except as to the amount of damages, there is no *genuine* issue as to any *material* fact and the movant is entitled to judgment as a matter of law on the issues stated in

---

[70] FAP ¶ 13.
[71] FAP ¶ 13.

the motion or in an answer or any other response. *Id.*; *JLB Builders, L.L. C. v. Hernandez*, 622 S.W.3d 860, 864 (Tex. 2021).

[¶ 53]  A court can grant a defendant traditional summary judgment only if the defendant's evidence as a matter of law either proves all elements of its defense or disproves at least one element of the nonmovant's claim. *See, e.g.*, *Park Place Hosp. v. Estate of Milo*, 909 S.W.2d 508, 511 (Tex. 1995) (causation disproved as a matter of law).

[¶ 54]  So, a summary judgment motion

> . . . is essentially a motion for a pretrial directed verdict. * * * Once such a motion is filed, the burden shifts to the nonmoving party to present evidence raising an issue of material fact as to the elements specified in the motion. * * * [Courts]  review the evidence presented by the motion and response in the light most favorable to the party against whom the summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. * * *

*Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 581–82 (Tex. 2006) (citations omitted).

[¶ 55] A genuine fact issue exists if more than a scintilla of evidence supports the alleged fact. *See Amazon.com Servs. LLC v. Grant*, No. 05-23-01306, 2024 WL 5053063, *2 (Tex. App.—Dallas Dec. 10, 2024, no pet.).

Evidence is more than a scintilla when it "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *King Ranch v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003) (quoting *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). However, less than a scintilla exists when the evidence is "so weak as to do no more than create a mere surmise or suspicion" of a fact. *Id.* (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)).

[¶ 56] When a partnership agreement's terms are unambiguous and the material facts are undisputed, compliance with those terms is a question of law for the court. *Hrdy v. Second St. Props.*, 649 S.W.3d 522, 554 (Tex. App.—Houston [1st Dist.] 2022, pet. denied).

[¶ 57] Accordingly, to decide this motion the court must apply contract and statutory construction principles to the TAPA, movants' motion, PEOFs' response, and the summary judgment evidence.[72]

---

[72] At common law, transactions between a partner and the partnership or other partners are presumed unfair, and the partner seeking to justify the transaction must prove its fairness. *Hrdy*, 649 S.W.3d at 539; *Texas Bank & Tr. Co. v. Moore*, 595 S.W.2d 502, 507 (Tex. 1980). However, the court need not address whether that burden allocation applies to statutory causes of action at trial because movants must conclusively establish the Callon sale's fairness to negate the breach element of PEOFs' "fiduciary" breach claims as a matter of law. *Hrdy*, 649 S.W.3d at 539, 554.

## B. Contract Construction Rules

[¶ 58] Courts construe partnership agreements like contracts. *Id.* A court's primary objective when construing contracts "is to ascertain and give effect to the parties' intent as expressed in the instrument." *U.S. Polyco, Inc. v. Texas Cent. Bus. Lines Corp.*, 681 S.W.3d 383, 387 (Tex. 2023) (quoting *URI, Inc. v. Kleberg Cty*, 543 S.W.3d 755, 763 (Tex. 2018)).

[¶ 59] Usually, courts deem the contract alone to express the parties' intent because it is objective, not subjective, intent that controls. *Id.*

[¶ 60] With unambiguous contracts, courts "can determine the parties' rights and obligations under the agreement as a matter of law." *Inwood Nat'l Bank v. Fagin*, No. 24-0055, 2025 WL 349890, *4 (Tex. January 31, 2025) (per curiam) (quoting *ACS Invs., Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997)).

[¶ 61] Additionally, context is a permissible indicator of meaning, and courts are to harmonize and give effect to all contract terms by analyzing them regarding the whole contract. *Polyco*, 681 S.W.3d at 390.

[¶ 62] Appropriate context includes the circumstances that existed when the parties made their contract:

> Context is not, however, confined to the two-dimensional contractual environs in which the words exist but may also encompass the circumstances present when the contract was entered. This is so because words are the skin of a living thought, and our quest is to determine, objectively, what an ordinary person using those words under the circumstances in which they are used would understand them to mean.

*Board of Regents of the Univ. of Texas Sys. v. IDEXX Labs., Inc.*, 691 S.W.3d 438, 444 (Tex. 2024) (per curiam) (quoting *URI, Inc.*, 543 S.W.3d at 764). Stated differently, context includes the business context and realities the words were meant to address. *Id.* at 445.

## C. Statutory Construction Rules

[¶ 63] Statutory construction's purpose is to implement the Legislature's intent by giving effect to every word, clause, and sentence. *Sunstate Equip. Co. v. Hegar*, 601 S.W.3d 685, 689–90 (Tex. 2020). Indeed, statutory text is the "first and foremost" indication of legislative intent. *Greater Hous. P'Ship v. Paxton*, 468 S.W.3d 51, 58 (Tex. 2015). Thus, courts apply the words' common, ordinary meaning unless (i) the text supplies a different meaning or (ii) the common meaning produces absurd results. *Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 838 (Tex. 2018).

[¶ 64] Further, courts derive statutory meaning from the entire statute. TEX. GOV'T CODE § 311.021(2); *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560,

572 (Tex. 2016). So, courts "presume the Legislature chose statutory language deliberately and purposefully," *Crosstex Energy Servs., L.P. v. Pro Plus, Inc.*, 430 S.W.3d 384, 390 (Tex. 2014), and that it likewise excluded language deliberately and purposefully, *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 540 (Tex. 1981).

[¶ 65] Absent contrary text, courts assume the Legislature uses statutory terms having a supreme-court-developed common law meaning to convey a consistent statutory meaning. *SandRidge Energy, Inc. v. Barfield*, 642 S.W.3d 560, 566 (Tex. 2022). But a statutory provision inconsistent with prior common law decisions "eliminates any instructive or persuasive value those decisions may have once had." *American Star Energy and Minerals Corp. v. Stowers*, 457 S.W.3d 427, 434 (Tex. 2015).

[¶ 66] Finally, but critically, Texas upholds parties' contractual freedom to narrow general fiduciary duties consistent with statutory minimum requirements:

> Unless otherwise provided by statute or law, duties owed by an agent to his or her principal may be altered by agreement. Accordingly, factors which must be taken into consideration when determining the scope of an agent's fiduciary duty to his or her principal include not only the nature and purpose of the relationship, but also agreements between the agent and principal.

*National Plan Adm'rs, Inc. v. National Health Ins. Co.*, 235 S.W.3d 695, 700 (Tex. 2007) (principal's contract with third-party administrator limited agent's fiduciary duties to its principal according to agreed terms); *Strebel v. Wimberly*, 371 S.W.3d 267, 284 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) (partnership agreement may limit partners' fiduciary duties).

[¶ 67] That is, "the substance of an agreement to act on behalf of a principal must be considered in determining the exact nature of the relationship." *National Plan*, 235 S.W.3d at 702–03. Even more specifically, parties may agree to limit an agent's general duty to act solely for the principal's benefit in all matters connected with their relationship. *Id.* at 703.

[¶ 68] Thus, courts will not impose a general fiduciary duty when the parties agreed that a partner can take actions that would otherwise violate it. *Id.* at 703. This is especially so where the contract results from a transaction between sophisticated parties represented by experienced representatives and counsel. *Id.* at 702.

## D. Interpretive Canons

[¶ 69] Further, the *expressio unius est exclusio alterius* canon, which presumes that purposeful inclusion of specific terms implies the purposeful exclusion of terms that do not appear, is a proper construction maxim absent a

valid alternative construction. *City of Houston v. Williams*, 353 S.W.3d 128, 145 (Tex. 2011); Antonin Scalia and Bryan A. Garner, READING LAW 107 (2012).

[¶ 70] Conversely, the *noscitur a sociis* canon—"it is known by its associates"—provides that a word or phrase's meaning, especially one in a list, should be known by the words immediately surrounding it. *Paxton*, 468 S.W.3d at 61. Courts rely on this canon to avoid giving a word a meaning so broad that it is incompatible with the statutory context. *Id.*

## E.    Intermediate Appellate Court Precedents

[¶ 71] This court began operating September 1, 2024, and the simultaneously created Fifteenth Court of Appeals has exclusive intermediate appellate jurisdiction over business court decisions. *See* Act of May 25, 2023, 88th Leg., R.S., ch. 380, §§ 8, 2023 TEX. SESS. LAW SERV. 919, 929 (H.B. 19) (business court creation); TEX. GOV'T CODE § 254.007 (appellate jurisdiction). And neither the Fifteenth Court nor this court has decided cases addressing this case's partnership issues. Thus, Texas Supreme Court decisions are currently the only judicial precedents addressing these issues. However, this court considers other intermediate appellate decisions for whatever persuasive value they have.

## F. Applicable Business Organizations Code Provisions

### 1. Introduction

[¶ 72] A limited partnership is a partnership formed by two or more persons, with one or more general partners and one or more limited partners. TBOC § 1.002(50); Byron F. Egan, EGAN ON ENTITIES 467 (4th Ed. 2023).

[¶ 73] TBOC Chapter 153 governs limited partnerships. However, Ch. 152's general partnership laws and other rules of law and equity compatible with Ch. 153 also apply to limited partnerships. TBOC § 153.003(a)–(b).

[¶ 74] Specifically, limited partnership managing partners are subject to Ch. 152's general partner duties and obligations. *Id.* §§ 152.204(a), 153.152(a)(1)–(2), 153.153(1)–(2); EGAN ON ENTITIES 475. Thus, PEC was subject to a partner's Ch. 152 statutory responsibilities. Further, the parties assume HoldCo exercised sufficient control over PEP such that rules applicable to general partners also apply to HoldCo's conduct.[73]

### 2. Chapter 152 Responsibilities

[¶ 75] PEOFs allege that HoldCo and PEC breached TBOC's loyalty and care duties and the related obligation to discharge them in good faith and in a

---

[73] Movants' Motion at 16, n.34; *see also Strebel*, 371 S.W.3d at 279 (fiduciary duties that otherwise do not exist may arise when a limited partner exercises control over the partnership).

manner the defendant reasonably believes to be in the partnership's best interests.[74] The applicable statutes include:

*General Conduct Standards*

(a)  A partner owes to the partnership [and]   the other partners . . .:

    (1)  a duty of loyalty; and

    (2)  a duty of care.

(b)   A partner shall discharge the partner's duties to the partnership and the other partners under this code or under the partnership agreement and exercise any rights and powers in the conduct . . . of the partnership business:

    (1)  in good faith; and

    (2)  in a manner the partner reasonably believes to be in the best interest of the partnership.

(c)  A partner does not violate a duty or obligation under this chapter or under the partnership agreement merely because the partner's conduct furthers the partner's own interest.

(d)  A partner, in the partner's capacity as partner, is not a trustee and is not held to the standards of a trustee.

TBOC § 152.204.

*Duty of Loyalty*

A partner's duty of loyalty includes:

---

[74] FAP ¶s 105–09, 112–114.

(1)  accounting to and holding for the partnership property, profit, or benefit derived by the partner: (A) in the conduct . . . of the partnership business; or . . . ;

(2) refraining from dealing with the partnership on behalf of a person who has an interest adverse to the partnership; and

(3)  refraining from competing or dealing with the partnership in a manner adverse to the partnership.

*Id.* § 152.205.

### *Duty of Care*

(a)  A partner's duty of care to the partnership and the other partners is to act in the conduct . . . of the partnership business with the care an ordinarily prudent person would exercise in similar circumstances.

(b)  An error in judgment does not by itself constitute a breach of the duty of care.

(c)  A partner is presumed to satisfy the duty of care if the partner acts on an informed basis and in compliance with Section 152.204(b).

*Id.* § 152.206.

### *Effect of Partnership Agreement and Nonwaivable Provisions*

(a)  Except as provided by Subsection (b), a partnership agreement governs the relations of the partners and between the partners and the partnership.  To the extent that the partnership agreement does not otherwise provide, this chapter and the other partnership provisions govern the relationship of the partners and between the partners and the partnership.

(b)  A partnership agreement or the partners may not:

(1)  unreasonably restrict a partner's or former partner's right of access to books and records under Section 152.212;

(2)  eliminate the duty of loyalty under Section 152.205, except that the partners by agreement may identify specific types of activities or categories of activities that do not violate the duty of loyalty if the types or categories are not manifestly unreasonable;

(3)  eliminate the duty of care under Section 152.206, except that the partners by agreement may determine the standards by which the performance of the obligation is to be measured if the standards are not manifestly unreasonable;

(4)  eliminate *the obligation of good faith under Section 152.204(b),* except that the partners by agreement may determine the standards by which the performance of the obligation is to be measured if the standards are not manifestly unreasonable;

* * *

*Id.* § 152.002 (emphasis added).

*Information Regarding Partnership*

(a) On request and to the extent just and reasonable, each partner and the partnership shall furnish complete and accurate information concerning the partnership to:

(1)  a partner; . . .

*Id.* § 152.213.

[¶ 76]  In short, the partners' agreement is the baseline for determining their responsibilities to the partnership and each other—subject to TBOC's minimum requirements.  TBOC § 152.002(a).

[¶ 77] Like 1994's Texas Revised Partnership Act (TRPA) before it, these statutes provide a more specific and explicit statement of a partner's duties to the partnership and other partners than existed under the common law and the prior Texas Uniform Partnership Act (TUPA). *See* Miller, *Partner Duties Under the Common Law and the Texas Business Organizations Code*, 68 The Advocate Ch. 18, § 1 (Miller, *Partner Duties*).

[¶ 78] However, because courts and commentators have been unclear regarding the extent to which the TBOC and its predecessors modified common law fiduciary principles, reviewing that statutory history aids their proper construction and application.

## G.   Legislative Background

[¶ 79] Before 1961, the common law governed Texas partnership law, *Ingram v. Deere*, 288 S.W.3d 886, 894–95 (Tex. 2009), and recognized fiduciary duties between partners, *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 593–94 (Tex. 1992) (citing *Johnson v. Peckham*, 120 S.W.2d 786, 787 (Tex. 1938)).

[¶ 80] In 1961, Texas adopted the TUPA. *Ingram*, 288 S.W.3d at 894. Without expressly defining partners as fiduciaries, the TUPA stated a partner's duty to account for partnership profits and hold them as "a trustee" and the

section governing partners' duties was titled "Partner Accountable as a Fiduciary." TUPA § 21(1). Thus, TUPA comported with treating partners as trustee-fiduciaries but did not unambiguously call them that.

[¶ 81] At common law and under TUPA, partners owed each other fiduciary duties to: (i) fully disclose all matters affecting the partnership, (ii) account for all partnership profits and property, (iii) refrain from self-dealing, and (iv) refrain from competing with the partnership. *Bohatch v. Butler & Binion*, 905 S.W.2d 597, 602 (Tex. App.—Houston [14th Dist.] 1995, *aff'd*, 977 S.W.2d 543 (Tex. 1998)).

[¶ 82] For example, the common law imposed a strict duty on partners to disclose material facts affecting the partnership or other partners—even if the partners have strained relationships and adverse interests. *See Johnson*, 120 S.W.2d at 787 (duty to disclose negotiations with third parties to resell partnership's property); Erin Larkin, Comment, *Partners' Duties Without the Word Fiduciary*, 59 Baylor L. Rev. 895, 899 (2010).

[¶ 83] Nonetheless, TUPA's text appeared to alter *Johnson's* voluntary disclosure requirement by imposing the disclosure duty on demand:

> Partners shall render on demand true and full information of all
> things affecting the partnership to any partner . . .

TUPA § 20.

[¶ 84] But § 20's commentary said that § 20 should not be construed to limit the disclosure duty to instances without demand when fiduciary principles would require full disclosure. *See* Larkin at 900–12; Alan R. Bromberg, *The Proposed Texas Uniform Partnership Act*, 14 Sw L. J. 437, 448 (1960) (comment to § 20, citing Byron D. Sher and Alan R. Bromberg, *Texas Partnership Law in the 20th Century – Why Texas Should Adopt the Uniform Partnership Act*, 12 Sw L.J. 263, 298–300 (1958)). And case law continued to express the full disclosure duty. *See Bohatch*, 905 S.W.2d at 602.

[¶ 85] However, effective January 1, 1994, Texas adopted the TRPA. *Ingram*, 288 S.W.2d at 894. TRPA § 4.03(c) provided that

> . . . [e]ach partner and the partnership shall furnish, on request and to the extent just and reasonable, to a partner complete and accurate information regarding the partnership.

[¶ 86] Despite nearly identical language as TUPA § 20, the Bar Committee Notes to TRPA § 4.03 (TRPA's successor to TUPA § 20 and predecessor to TBOC § 152.213) reached a different conclusion regarding the disclosure duty:

> Subsection (c) is based on TUPA § 20 and provides that partners must be furnished, on demand, complete and accurate information concerning the partnership to the extent just and

reasonable. *This information right arises only on request; the information need not be volunteered.* * * *

Comment of Bar Committee—1993, Art. 6132b-4.03 (emphasis added).

[¶ 87] Commentators and courts debated the extent to which the TRPA changed the common law, including whether it eliminated *Johnson's* voluntary full-disclosure duty. *See* Elizabeth S. Miller, *Overview of Fiduciary Duties, Exculpation, and Indemnification in Texas Business Organizations*, 49-SUM Tex. J. Bus. L. 1, 36–47 (2020) (Miller, *Overview*); Larkin at 900–12.

[¶ 88] Although the Legislature derived TRPA from the Uniform Law Commission's Revised Uniform Partnership Act (RUPA), there are informative differences. For example, RUPA § 404 describes its "General Standards of Partner's Conduct" as fiduciary duties, but TRPA does not. And TRPA § 4.04(f)'s added provision that a partner is not a trustee and is not held to the standards of a trustee arguably further evidenced that TRPA replaced partners' common law fiduciary principles with specific statutory standards, while leaving the common law as a gap-filler. Larkin at 900–12. That is, unlike RUPA § 404, TRPA § 4.04 created ambiguity by providing that a partner's loyalty duty was not limited to only those duties stated in the text.

*Compare* RUPA § 404(b) ("A partner's duty of loyalty to the partnership and the other partners is *limited to the following . . .*" (emphasis added)) *with* TRPA § 4.04(b) ("A partner's duty of loyalty *includes . . .*" (emphasis added)).

[¶ 89] Soon after TRPA's enactment, the supreme court described a partner's statutory duties to the partnership and other partners as "in the nature of a fiduciary duty in the conduct" of partnership business. *M.R. Champion, Inc. v. Mizell*, 904 S.W.2d 617, 618 (Tex. 1995). However, that statement's effect on the TRPA is unclear because the prior TUPA and common law governed that case. *Id.* at 618, n.1. And the court held that the applicable principle—former partners have no duty to offer a business opportunity to each other—is the same under the old and new laws. *Id.*

[¶ 90] So, the Fifth Circuit Court of Appeals commented on the lack of clarity regarding TRPA's effect on prior TUPA and common law principles. *In re Gupta*, 394 F.3d 347, 351–52 (5th Cir. 2004).

[¶ 91] Moreover, it is hard to tell whether the fiduciary duty discussions in *Cruz v. Ghani*, No. 05-17-0056-CV, 2018 WL 6566642, *6 (Tex. App.—Dallas 2018, no pet); *Shannon Medical Center v. Triad Holdings III, L.L.C.*, 601 S.W.3d 904, 909–15 (Tex. App.—Houston [14th Dist.] 2019, no pet.); and *Red Sea Gaming, Inc. v. Block Invs. (Nevada) Co.*, 338 S.W.3d 562, 568

(Tex. App.—El Paso 2010, pet. denied) (and similar cases) state the applicable law because they involve unobjected to jury charges.[75]

[¶ 92] In sum, the extent to which the TRPA and the TBOC replaced common law principles—and especially the disclosure duty—is unclear. It is with that background that the court discusses the TBOC's application here.

## H. The Nature and Scope of HoldCo's and PEC's Duties and Obligations

### 1. Introduction

[¶ 93] PEOFs posit ten causes of action. All but one allege direct or indirect (conspiracy, aiding and abetting, and knowing participation in) fiduciary breach claims without delineating between common law or TBOC duties.[76] PEOFs' summary judgment response is equally non-differentiating.[77] Therefore, the court begins by discussing the current status of TBOC partnership "fiduciary duties."

### 2. Applicable Loyalty and Care Duties and Discharge Obligations

[¶ 94] It is axiomatic that the court must identify the nature and scope of HoldCo's duties and obligations to PEP and its partners before it can

---

[75] Where an appellant did not object to the jury charge, evidentiary sufficiency issues are measured against the charge as written and not necessarily the correctly stated law. *Cruz*, 2018 WL 6566642, at *6. *Red Sea Gaming*, 338 S.W.3d at 566.

[76] FAP ¶s 104–68.

[77] *See* PEOFs' MSJ Resp. at 11–30 (combining common law and statutory principles).

address whether HoldCo conclusively established that it did not breach those responsibilities as PEOFs claim.[78] (The court collectively refers to a partner's "fiduciary" duties and obligations as "responsibilities.")  The existence of a legal duty is a threshold legal question for the court to decide.  *Humble Sand & Gravel, Inc. v. Gomez*, 146 S.W.3d 171, 181, n.20 (Tex. 2004).

[¶ 95] Where, as here, determining the nature and scope of a partner's duties and obligations is a matter of statutory and contract construction, that process begins with the TAPA:

> [A]  partnership agreement governs the relations of the partners and between the partners and the partnership.  To the extent that the partnership agreement does not otherwise provide, this chapter and the other partnership provisions govern the relationship of the partners and between the partners and the partnership.

TBOC § 152.002(a)

[¶ 96] Because here, the partners agreed that they would have the "duties of good faith and fair dealing" to the fullest extent required by Texas law (TAPA § 5.9(a)) but otherwise disclaimed any "fiduciary duties" to the

---

[78] For clarity, "causes of action" are legal theories supporting a right to relief such as negligence or contract breach.  "Claims," when used as a noun, are assertions a party makes to describe the factual basis supporting a cause of action or affirmative defense.  For example, "Defendant breached the contract by . . ."  "Grounds" are legal bases underlying a party's request for court action.  For example, "the court should grant summary judgment because . . ."  Parties should be careful to properly use these terms.

fullest extent permitted by law (TAPA §§ 5.9(b)–(c)), we turn to applicable TBOC sections to determine what duties and obligations remained. That analysis produces these results:

### a. Affirmative Responsibilities

[¶ 97] At common law, a trustee is held to strict fiduciary standards:

> Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions. *** Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd.

*Meinhard v. Salmon*, 249 N.Y. 458, 464, 164 N.E. 545, 546 (1928) (citation omitted) (trustee standards applied to joint venturer).

[¶ 98] However, TBOC § 152.204(d) provides that partners are not held to a trustee's standards. And TBOC, like its predecessor TRPA, omits the word "fiduciary" when prescribing partners' duties to the partnership and other partners. So, based on plain text, traditional trustee-fiduciary duties, as such, do not apply to partners except (i) as TBOC imposes analogous statutory

duties and obligations; (ii) the TBOC incorporates compatible common law principles; or (iii) partners agree to impose them on themselves.

[¶ 99] Loyalty and care duties and the obligations to perform them (i) in good faith and (ii) in a manner the partner reasonably believes to be in the partnership's best interest are among the responsibilities TBOC imposes. *Id.* § 152.204(a)–(b).

[¶ 100] TBOC's list of loyalty duties is not exclusive because "includes" precedes that list. *Id.* § 152.205. So, common law loyalty principles apply if compatible with Ch. 152 and the partnership agreement. *Id.* § 152.003. And, under the *noscitur a sociis* canon, any supplemental common law loyalty duties must be of the type listed in § 152.205 and consistent with other partnership statutes and permitted TAPA terms. *See Paxton*, 468 S.W.3d at 61.

[¶ 101] However, TBOC's duty of care definition is exclusive because it omits expansive language.[79] *See* TBOC § 152.206; *City of Houston*, 353 S.W.3d at 145. That is,

---

[79] § 152.206(c)'s statement that a partner is presumed to satisfy its duty of care if it acts on an informed basis and in compliance with its § 152.206 obligations is an evidentiary presumption, not a separate statutory responsibility. *Id.*

> Nothing is to be added to what the text states or reasonably implies (*casus omissus pro omisso habendus est*).

READING LAW 93.

[¶ 102] And, unless modified, the TBOC retains the common law obligations to act in good faith and in a manner the partner reasonably believes to be in the partnership's best interest. TBOC § 152.204(b).

[¶ 103] The TBOC also imposes a duty upon request and to the extent just and reasonable to provide partners with accurate information concerning the partnership. *Id.* § 152.213.

### b. Modifications to Responsibilities

[¶ 104] One of the principal trustee duties the TBOC removes from partners' duties is a trustee's duty to place its beneficiary's interest above the trustee's interest. *See* TBOC §152.204(d) (elimination of trustee status and duties); BOGERT'S THE LAW OF TRUSTS AND TRUSTEES § 543 (Trustee's duty of loyalty to the beneficiaries).

[¶ 105] Further, partners do not violate their responsibilities merely because the partner acts in its own interest. *Id.* § 152.204(c).

[¶ 106] Although partners may not completely eliminate their responsibilities, they may define specific conduct that does not violate them

provided those terms are not manifestly unreasonable. *Id*. § 152.002(b). The TBOC does not state any "magic words" that are required to implement these contractual carveouts to the statutory responsibilities.

[¶ 107] However, partners may eliminate the obligation to perform their duties and exercise any rights and powers under the partnership agreement in a manner the partner reasonably believes to be in the partnership's best interest if such terms are not manifestly unreasonable. *See id.* § 152.002(b)(4). That is because § 152.002(b)'s list of unwaivable responsibilities mentions a partner's obligation to perform its duties in good faith under § 152.204(b)(1) without also listing a partner's obligation to discharge its duties in a manner it reasonably believes to be in the partnership's best interest under § 152.204(b)(2). *Id*. § 152.002(b)(4).

[¶ 108] That partners may waive the obligation to act in a manner the partner reasonably believes to be in the partnership's best interest comports with §§ 152.204(c), (d).

[¶ 109] Moreover, the *expressio unius est exclusion alterius* canon further supports that result because § 152.002(b)(4) mentions the good faith obligation while not mentioning the separate obligation to perform those

obligations in a manner the partner reasonably believes is in the partnership's best interest. *City of Houston*, 353 S.W.3d at 145.

### 3. Good Faith and Fair Dealing

[¶ 110] Although TBOC § 152.204(b)(1) requires partners to discharge their contract rights and duties and TBOC loyalty and care duties in good faith, that obligation does not rise to the level of a separate "fiduciary" duty as such:

> Though courts may be tempted to elevate this language to an independent duty, this obligation is not stated as a separate duty, but merely as a standard for discharging a partner's statutory or contractual duties.

Elizabeth S. Miller, *Fiduciary Duties, Exculpation, and Indemnification in Texas Business Organizations*, State Bar of Texas Advanced Business Law Course 30 (2023) (Miller, *Fiduciary Duties*); *see* Comment of Bar Committee—1993, Art. 6132b-4.04 (good faith obligation "is not a separate duty" it is "merely a statement of how any duty . . . must be discharged").

[¶ 111] Unlike loyalty and care duties, the TBOC does not define the "good faith" discharge obligation. *See* TBOC § 152.204(b)(1). Thus, courts refer to the common law for that meaning. *Id.* § 152.003; *SandRidge*, 642 S.W.3d at 566.

[¶ 112] *Fitz-Gerald v. Hull*, holds that partners owe each other the "utmost good faith and the most scrupulous honesty." 237 S.W.2d 256, 265 (Tex. 1951). *Bohatch v. Butler & Binion*, subsequently reiterated that principle but concluded that terminating a partner for reporting alleged overbilling did not violate the principle. 977 S.W.2d 543, 545–47 (Tex. 1998).

[¶ 113] Later, the supreme court clarified that, although a partner's common law fiduciary duty includes a duty of good faith and fair dealing, that duty requires only that the parties "deal fairly" with each other and does not include the more onerous fiduciary duty to place the other party's interests before its own:

> Although a fiduciary duty encompasses at the very minimum a duty of good faith and fair dealing, the converse is not true. The duty of good faith and fair dealing merely requires the parties to "deal fairly" with one another and does not encompass the often more onerous burden that requires a party to place the interest of the other party before his own, often attributed to a fiduciary duty.

*Crim*, 823 S.W.2d at 594. However, the court did not further define "deal fairly." Nor has it since done so.

[¶ 114] Case law indicates that the statutory good faith obligation includes, at a minimum, not lying to or misleading other partners. *See, e.g.*, *Shannon Medical*, 603 S.W.3d at 912–915 (partner misled partners regarding

permitted affiliate business); *Cruz*, 2018 WL 6566642, *10–16 (partner misrepresented reasons for closing one business and misled partner regarding permitted competing business); *Red Sea Gaming*, 338 S.W.3d at 568–69 (failure to disclose resale opportunity while negotiating buyout).

[¶ 115]  However, one does not act in bad faith by exercising its lawful rights:

> Improper motives cannot transform lawful actions into actionable torts. "Whatever a man has a legal right to do, he may do with impunity, regardless of motive, and if in exercising his legal right in a legal way damage results to another, no cause of action arises against him because of a bad motive in exercising the right."

*Texas Beef Cattle Co. v. Green*, 921 S.W.2d 203, 211 (Tex. 1996) (quoting *Montgomery v. Phillips Petroleum Co.*, 49 S.W.2d 967, 972 (Tex. Civ. App.—Amarillo 1932, writ ref'd) (quoting 1 R.C.L. § 6 at 319)).

[¶ 116]  Thus, one does not lack good faith by exercising lawful contract rights.  *See Exxon Corp. v. Atlantic Richfield Co.*, 678 S.W.2d 944, 947 (Tex. 1984) ("There can be no implied covenant as to a matter specifically covered by the written terms of the contract."); *English v. Fischer*, 660 S.W.2d 521, 523 (Tex. 1983) (No implied covenant of good faith and fair dealing required mortgagee to disburse insurance proceeds contrary to contract terms.); *John*

*Masek Corp. v. Davis*, 848 S.W.2d 170, 174 (Tex. App.—Houston [1st Dist.] 1992, writ denied) (approved jury instruction that a "fiduciary duty [] does not extend so far as to create duties in derogation of the express terms of the partnership agreement").

[¶ 117] Further, good faith is often best described as not in bad faith.

> Good faith, as judges generally use the term in matters contractual, is best understood as an "excluder" – a phrase with no general meaning or meanings of its own. Instead, it functions to rule out many different forms of bad faith. It is hard to get this point across to persons used to thinking that every word must have one or more general meanings of its own – must be either univocal or ambiguous.

*See* Robert S. Summers, *"Good Faith" in General Contract Law and the Sales Provisions of the Uniform Commercial Code*, 54 Va. L. Rev. 195, 262 (1968).

### 4. Duties of Candor and Mandatory Disclosures

#### a. Introduction

[¶ 118] Some courts have recently held that partners owe a fiduciary duty (i) to make full disclosure of all matters affecting the partnership, including a duty to account for all partnership profits and property and (ii) a strict duty of good faith and candor. *See Zinda v. McCann Street, Ltd.*, 178 S.W.3d 883, 890–91 (Tex. App.—Texarkana 2005, pet. denied); *Houle v. Casillas*, 594 S.W.3d 524, 552 (Tex. App.—El Paso 2019, no pet.).

[¶ 119] Such rulings concern two issues: (i) does the good faith obligation encompass the honesty requirement; and (ii) does the *Johnson v. Peckham* mandatory duty to disclose all facts that could materially affect the partnership, or other partners, continue after TRPA § 4.03 and TBOC § 152.213. "Yes" is the answer to the former, and "it depends on the circumstances" is the answer to the second.

### b. Good Faith and Candor

[¶ 120] To begin, *Zinda* for example equates good faith and candor. 178 S.W.3d at 890–91. Because "candor" means "[t]he quality of being open, honest, and sincere; frankness; outspokenness," *Candor*, BLACK'S LAW DICTIONARY (12th ed. 2024), the TBOC effectively incorporates the candor duty to be honest in § 152.204(b)(1)'s good faith obligation.

### c. Voluntary Disclosure

[¶ 121] Although *Zinda* cited TRPA § 4.04 as authority for a broad duty to disclose all information affecting the partnership, that court did not address whether § 4.03 retained the prior *Johnson v. Peckham* duty to voluntarily disclose, even without request, all material information. 178 S.W.3d at 890–91.

[¶ 122] Like TRPA § 4.03, the TBOC requires partners to provide information on reasonable request. TBOC § 152.213. So, the debate regarding the *Johnson* rule after TRPA § 4.03 applies to TBOC § 152.213 too. However, although the TBOC does not expressly so state, the common law good faith obligation also applies to § 152.213. *See id.* § 152.003 (common law supplement to TBOC). However, those concepts are limited to (i) the common law definition of "good faith" to mean "deal fairly," *Crim*, 823 S.W.2d at 593–94, and (ii) statutory constraints that §§ 152.204(c), (d), and 152.213 and any applicable partnership agreement terms impose.

[¶ 123] Since Texas adopted TRPA § 4.03, the Texas Supreme Court has provided little guidance regarding a partner's duty to voluntarily provide information affecting the partnership. For example, in *American Star Energy and Minerals Corp. v. Stowers*, the Supreme Court suggested in *dicta* that there are circumstances when the duty of care may require a partner to disclose material information affecting the partnership's operation. 457 S.W.3d at 434–35.

[¶ 124] That statement is *dicta* because the issue there was when do limitations begin to run in a suit to enforce a partnership's contract liability against a partner. The Supreme Court held that, based on the partnership as

an entity theory, partners were not individually liable until the partnership's liability was finally established at which time limitations began running against the individual partner. *Id.* at 428–30, 435.

[¶ 125] Responding to the partners' argument that due process required that they be joined in the suit against the partnership, the court explained that (i) as a matter of law the partners had notice of their potential liability when they became partners; (ii) citing *Zinda*, the court stated that the duty of care "may" require partner to inform other partners of a suit against the partnership; and (iii) partners can agree in their partnership agreement for a partner served with a lawsuit against the partnership to provide that information to the other partners. *Stowers*, 457 S.W.3d at 434–35.

[¶ 126] Regarding the second point, the court did not discuss TRPA § 4.03 or TBOC 152.213. *Id.* Nor did it explain what circumstances "may" require disclosures. *Id.* Finally, the court did not explain why such a duty falls under the care duty instead of the good faith obligation. *Id.* So, *Stowers* does not guide as to when partners must voluntarily disclose information to other partners. And that statement may be construed as a "suggestion" that such an obligation survives after TRPA § 4.03 and TBOC § 152.213. Miller, *Fiduciary Duties* 30.

[¶ 127] Additionally, "[a]s a general rule, silence may be equivalent to a false representation only when the particular circumstances impose a duty on the party to speak and he deliberately remains silent."[80] *Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001). And, in an arm's-length transaction, a duty to disclose facts does not exist absent a misleading statement about facts and the complaining party lacked an equal opportunity to discover the facts. *See id.* 756.

[¶ 128] Without firm rules concerning when a partner must volunteer information regarding circumstances not expressly mentioned in § 152.213, the court applies these standards in this case:

- A partnership agreement may address the issue either directly or indirectly by omission. *See* TBOC §§ 152.002(a) (partnership agreement governs the relations among partners and the partnership), 152.002(b)(2)–(4) (ability to modify loyalty and care duties and good faith obligation); *Nafta Traders, Inc. v. Quinn*, 339 S.W.3d 84, 95–96 (Tex. 2011) (contract freedom);

---

[80] For example, fraud by omission may occur where a person discovers new information that makes an earlier material representation false or misleading, *Dewayne Rogers Logging, Inc. v. Propac, Ltd.*, 299 S.W.3d 374, 391 (Tex. App.—Tyler 2009, pet. denied); or a person makes a partial disclosure that leaves a false impression, *Mercedes-Benz USA, LLC v. Cardusco, Inc.*, 583 S.W.3d 553, 561–62 (Tex. 2019).

*FPL Energy, LLC v. TXU Portfolio Mgmt. Co.*, L.P., 426 S.W.3d 59, 68 (Tex. 2014) (omissions may be read as intentional).

- Absent a partnership agreement standard, partners must disclose material information affecting the partnership or other partners that ordinarily would not be expected to be covered by a partnership agreement. For example, a partner must tell at least partnership management when the partner is served with a suit against the partnership. *See Stowers*, 457 S.W.3d at 434–35.

- A partner may not mislead the partnership or other partners where fraud by omission principles would apply absent the partnership relationship. *See* ¶s 114, 127.

- That a partner is acting in its self-interest does not by itself create a duty to voluntarily disclose information regarding its conduct if the partnership agreement lawfully permits that conduct. *See* TBOC § 152.204(c), (d).

- A partner need not disclose facts that would be immaterial under the circumstances, including circumstances contemplated by the partnership agreement.

### 5. Separate Analysis Required

[¶ 129] TBOC's text divides partners' loyalty and care *duties* on one hand from their *obligation* to *discharge* them in good faith (and when applicable

in a manner the partner reasonably believes to be in the partnership's best interest) on the other hand. *See* TBOC § 152.204.

[¶ 130] For example, one can perform its loyalty duty according to the partnership agreement's terms but discharge that duty in bad faith by lying to or misleading its partners while doing so. *See, e.g.*, *Shannon Medical*, 603 S.W.3d at 912–915; *Cruz*, 2018 WL 6566642, *10–16; *Red Sea Gaming*, 338 S.W.3d at 568–69. On the other hand, the good faith obligation is irrelevant for liability purposes if the partner breached the duty by engaging in prohibited conduct.

[¶ 131] So, courts should analyze whether a duty is breached before considering whether the defendant acted in good faith and, when applicable, in a manner it reasonably believed was in the partnership's best interest.

## VI. APPLICATION

### A. Introduction

[¶ 132] Movants basically argue that PEOFs' claims fail in their entirety because (i) the TAPA authorized HoldCo to exercise its drag-along rights and force the other partners to participate in selling PRD's assets in an Exit Event; (ii) HoldCo complied with its TAPA conditions to wait two years and conduct the sale in an arm's-length transaction; and (iii) its contract rights and conduct

satisfied Texas law's minimum requirements since TAPA defines conduct that meets the minimum requirements of loyalty and care and it acted in good faith.

[¶ 133] Conversely, PEOFs primarily argue that "Blackstone" breached its contract good faith duty and statutory responsibilities in several ways— including by failing to act in the partnership's best interest regarding the consideration received and the processes HoldCo used to analyze the deal.

[¶ 134] In short, the analysis converges on whether HoldCo acted in good faith when it exercised its drag-along rights and forced the sale of PRD's assets to Callon on terms HoldCo selected. Because movants seek complete dismissal of all claims against them, the court addresses all claims PEOFs assert against movants regardless of whether movants expressly addressed every such claim.

## B.   PEOFs' Claims by Category

[¶ 135] PEOFs' petition and the parties' submissions do not divide their arguments between distinct breach of loyalty, care, or good faith

responsibilities. And several of PEOFs' claims are variations of the same idea. Nonetheless, PEOFs' claims include these categories:[81]

- **Loyalty**: (i) failing to act in the partnership's best interest; (ii) structuring the deal to benefit "Blackstone;" (iii) prioritizing "Blackstone's" interest in fossil fuel divestment over acting in Primexx's best interests; (iv) acting in "Blackstone's" sole interest; (v) structuring a deal that would provide no return for PEOFs but would generate a substantial recovery for Blackstone; (vi) accepting an unfair sales proceeds' allocation; (vii) directing the sale to proceed despite knowing it was a bad deal; (viii) failing to maximize the value and return for PEP or other Unitholders aside from furthering "Blackstone's" interests; and (ix) failing to ensure "Blackstone" had no conflicts of interest.

- **Care**: (i) failing to keep PEOFs informed about the potential sale leading up to the sale; (ii) failing to conduct regular board meetings to discuss whether the sale made sense from the company's perspective; (iii) forcing a rushed sale; (iv) forcing the sale with only one business days' notice of the final terms; (v)

---

[81] Any claims not mentioned here are variations of what is discussed and are treated in the same manner. If the court calls a loyalty claim a care claim or vice-versa, it is regarded as such.

failing to take steps to maximize the value for PEP or the Unitholders; (vi) inadequate due diligence and marketing; (vii) preventing the board or other Unitholders from analyzing the terms; (viii) failing to professionally market the business or its assets; (ix) failing to analyze whether it was more profitable to run the business as a stand-alone operation than to sell it; (x) failing to consider alternatives; (xi) failing to consider whether a rushed sale would be fair to PEP or its partners, including PEOFs; and (xii) failing to properly distribute proceeds according to the waterfall.

- **Good faith**: All the above.

## C. Overall Considerations

[¶ 136] The court must analyze PEOFs' claims under the TAPA subject to TBOC minimum standards. That is, Texas recognizes these sophisticated parties' freedom to contract within TBOC's minimum standards. *See, e.g.*, TBOC § 152.002(a); *Royston, Rayzor, Vickery, & Williams, LLP v. Lopez*, 467 S.W.3d 494, 504 (Tex. 2015). Indeed, Texas regards parties' freedom to contract as they wish (within public policy) a sacred right:

> As a fundamental matter, Texas law recognizes and protects a broad freedom of contract. We have repeatedly said that "if there is one thing which more than another public policy requires it is that men of full age and competent understanding shall have the utmost liberty of contracting, and that their

contracts when entered into freely and voluntarily shall be held sacred and shall be enforced by Courts of justice."

*Nafta Traders*, 339 S.W.3d at 95–96 (quoting *Fairfield Ins. Co. v. Stephens Martin Paving, LP*, 246 S.W.3d 653, 664 (Tex. 2008)).

[¶ 137] Moreover, freedom of contract principles require courts to "recognize that 'sophisticated parties have broad latitude in defining the terms of their business relationship,' and courts are obliged to enforce the parties' bargain according to its terms." *Sundown Energy LP v. HJSA No. 3 P'ship*, 622 S.W.3d 884, 889 (Tex. 2021) (quoting *FPL Energy*, 426 S.W.3d at 67). Therefore, courts may not rewrite a contract under the guise of interpretation. *Id.*

[¶ 138] Here, the parties agreed to minimize HoldCo's and PEC's loyalty and care duties to the extent Texas law permits and agreed that HoldCo would discharge the remaining duties in good faith to the fullest extent Texas law requires.

[¶ 139] The court's analysis is also informed by these undisputed facts:

- These are sophisticated parties represented by counsel.

- Drag-along rights are established vehicles used to facilitate equity investments.

- PEOFs empowered HoldCo and PEC to exercise HoldCo's drag-along rights in their sole interest and discretion and in a manner that served HoldCo's (and by extension its affiliates') and PEC's interests—if it waited two years, completed an arm's-length transaction, and dealt fairly in doing so.

- PEOFs agreed that PEP's Unitholders must follow HoldCo's instructions when it exercised its drag-along rights.

- That is, PEOFs agreed to a structure that gave Blackstone, Inc.—acting through HoldCo—a majority of PEC's board seats; required all Unitholders to fulfill HoldCo's directions regarding the sale, thereby requiring all partner appointed directors and, thus, PEC to approve the sale at HoldCo's direction; and removed any discretionary PEC power to disobey HoldCo's directions regarding the Callon sale.[82]

[¶ 140] In short, that is the deal PEOFs made and the deal the court is to enforce to the full extent Texas law permits.

---

[82] *See* TAPA § 6.7 (Unitholders must instruct their directors to approve the sale).

### D. Breach of Statutory Responsibilities

#### 1. Introduction

[¶ 141] Although PEOFs' "fiduciary" breach causes of action are properly TBOC breach causes of action, the court uses the elements of a common law fiduciary breach claim to frame a TBOC cause of action's elements as: (i) a statutorily recognized relationship between the plaintiff and defendant, (ii) the defendant's breach of a statutory responsibility to the plaintiff, and (iii) the defendant's breach caused an injury to the plaintiff or a benefit to the defendant.[83] *See McLeod v. McLeod*, 644 S.W.3d 792, 804 (Tex. App.—Eastland 2022, no pet.) (fiduciary breach elements).

[¶ 142] It is undisputed that HoldCo and PEC were PEP partners and owed PEOFs statutory loyalty and care duties and an obligation to discharge them in good faith regarding the Callon sale—subject to their agreed modifications to those responsibilities.[84] And PEOFs do not claim that any TAPA modifications to those responsibilities is manifestly unreasonable. *See* TBOC §§ 152.002(b)(2)–(4); *Cruz*, 2018 WL 6566642, *14.

---

[83] There are not two separate breach of fiduciary duty causes of action: one under the statute and one under the common law. Rather, there is only a cause of action based on the code that may incorporate certain common law aspects that are compatible with the code.

[84] *See* ¶ 74.

[¶ 143] Accordingly, the court must (i) define the nature and scope of the applicable responsibilities and (ii) decide whether PEOFs raised a genuine issue of material fact regarding their alleged breach regarding the Callon sale.

## 2. First Cause of Action: "Fiduciary" Breach (HoldCo)

### a. Preface

[¶ 144] The Callon sale resulted from agreements the parties created five years earlier. Their term sheet shows that "Blackstone" expected, among other things, (i) control over PEC's board with five of nine directors and (ii) "customary drag-along rights" regarding a proposed sale of 100% of the partners' interests.[85] The TAPA embodies those points.

[¶ 145] The parties implemented this arrangement through the PIPA;[86] the TAPA;[87] and PEC Bylaws.[88] PEOFs do not claim those contracts were signed under duress or they did not understand their risks.

[¶ 146] Whittier Trust Co., by Steven Anderson, signed the TAPA as PEOF I's general partner.[89] PEC's Bylaws identified Jim Jeffs and Robert

---

[85] TAPA at Annex B (Summary of Proposed Terms, Term Sheet-Royalties Vehicle).
[86] PIPA.
[87] TAPA.
[88] Movants' Ex. 10 (Bylaws).
[89] TAPA.

Holland as PEOF I's "Fund Directors" and Holland as PEC's General Counsel and Secretary.[90] Jeffs' declaration confirms that he was appointed to serve as a PEC director.[91] Whittier's professional financial managers represented PEOFs.[92]

[¶ 147] PEOF I, PEC, and HoldCo made that deal, which PEOF II accepted.

### b. Loyalty and HoldCo's Drag-Along Rights

#### i. Introduction

[¶ 148] At a high level, the loyalty duty concerns a transaction's substance and whether a partner acted with conflicts of interest. *See* TBOC § 152.205 (loyalty includes refraining from (i) acting on behalf of a conflicted person, (ii) competing with the partnership, or (iii) dealing with the partnership in a manner adverse to the partnership).

[¶ 149] Thus, the court begins with those requirements and considers the extent to which the TAPA lawfully limits those duties. In sum, the TAPA and TBOC combine to produce these Callon sale results: (i) HoldCo must give

---

[90] Movants' Ex. 10 (Bylaws).
[91] Jeffs Dec. ¶ 2.
[92] *See* Derrington Dec. ¶s 3, 6.

PEOFs reasonable access to books and records, including a duty to account for and distribute Callon sale profits according to the waterfall; (ii) HoldCo need not conduct the sale in a manner it reasonably believed was in PEP's or PEOFs' interests; (iii) HoldCo could negotiate the sale terms in its sole discretion and in its own sole interest (including PEC's and "Blackstone's" interests) without subordinating its interests to PEP's or the other partners' interests—if it waited two years and conducted an arm's-length transaction; and (iv) HoldCo had to comply with the TAPA's terms and "deal fairly" with PEP and its partners while exercising its drag-along rights.

### ii. Accounting for Proceeds

[¶ 150] PEOFs allege that HoldCo did not properly distribute Callon sale proceeds according to the TAPA waterfall.[93] Movants' *motion* asserts that "[t]he sale proceeds were [] distributed to the partners pursuant to the agreed waterfall in the Limited Partnership Agreement" and includes some evidence

---

[93] FAP ¶ 98.

to that effect.[94]  PEOFs did not respond to movants' argument or provide any corresponding evidence.[95]

[¶ 151]  However, a summary judgment motion itself is not evidence. *Americana Motel, Inc. v. Johnson*, 610 S.W.2d 143 (Tex. 1980).  And movants' evidence does not conclusively negate PEOFs' improper payment claim. *Frost Nat. Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010).  So, PEOFs "ha[d] no burden to respond to [the]  summary judgment motion" on this issue. *M.D. Anderson Hosp. & Tumor Inst. v. Willrich*, 28 S.W.3d 22, 23 (Tex. 2000).

[¶ 152]  Movants' evidence tends to show that PEOF II (but not PEOF I) received money and Callon shares and the value of those shares.[96]  However, that does not disprove PEOFs' claim that common Unitholders may have been paid ahead of preferred Unitholders contrary to the waterfall.   So, the court denies movants' motion to the extent it seeks dismissal of PEOFs' claim that

---

[94] Movants' MSJ at 3; Movant's Exs. 7, 8, 11.

[95] *See* PEOFs' Resp. at 8.  PEOFs' only reference to the waterfall payment structure in their response was that "Blackstone was the only investor to receive any significant proceeds from the sale," citing to a different portion of their petition than where this allegation appears. *Id.* Accordingly, the court understands this statement was offered in support of PEOFs' allegation that the Callon sale was fundamentally unfair to the non-HoldCo investors, not that the waterfall was distributed improperly.

[96] Movant's Exs. 7 (PEOF II Distribution Letter), 8 (AST Callon Petroleum Share Registration Statement), 11 (NASDAQ Historical Data for CPE).

HoldCo failed to properly account for and distribute the Callon sale profits according to the waterfall.

### iii.    Allocation of Proceeds between PEP and BPP

[¶ 153]  PEOFs allege that HoldCo unfairly structured the allocation of sales proceeds between PEP and BPP (the sidecar business) to advantage BPP's owners and disadvantage PEP's owners.[97]  Movants' motion did not address that claim.  Thus, the court denies summary judgment regarding it.

### iv.    Remaining Loyalty Claims

[¶ 154]  TAPA § 6.7 addresses the nature and scope of HoldCo's Callon loyalty duty by defining permitted conduct.  And, reading § 6.7 together with § 5.9 and the circumstances surrounding HoldCo's private equity investment in PEP further inform the parties' objective understanding regarding the nature and scope of HoldCo's Callon sale responsibilities.  *Polyco*, 681 S.W.3d at 391 (construe contracts as a whole giving effect to all contract terms).

[¶ 155]  That is, the parties broadly met TBOC § 152.002(b)(2) contract-created loyalty standards by framing specific activities that do not violate the loyalty duty.  For example, TAPA §§ 5.4 through 5.9 and 5.11 span more than

---

[97] FAP ¶s 96, 107, and 108.

three pages discussing "arm's-length" or fair market value requirements and fairness standards for potential conflicted transactions that might otherwise breach loyalty duties.[98]  So, the partners identified those circumstances, considered their risks, and negotiated protections.  Thus, they knew how to identify and negotiate regarding risks.

[¶ 156] More specifically, TAPA § 5.9 defines conduct that would not violate loyalty duties, including granting all partners—including PEC—the ability to

> . . . decide or determine any matter in its sole and absolute discretion taking into account solely its interest and those of its Affiliates (excluding the Partnership and its Subsidiaries) subject to the Agreed Duties.  Each Partner further acknowledges and agrees that it would not have become a Partner in the Partnership if this arrangement were not acceptable to it.

[¶ 157] They further defined Agreed Duties to mean "to the fullest extent required by Texas law, . . . the duties of good faith and fair dealing . . .," which means the duty to "deal fairly." *Crim*, 823 S.W.2d at 593–94.

---

[98] TAPA § 5.4 Gas Purchasing Lines; § 5.05 Farmouts; § 5.6 Sales of Properties to Partnership; § 5.7 Purchases Properties from Partnership; § 5.8 Fair Market Value; and § 5.11 Competitive Activities and AMI.

[¶ 158] Those agreements extend to HoldCo's § 6.7 drag-along rights involving an "Exit Event," which includes "(i) the consummation of a sale of the Partnership substantially as a whole in one transaction or a series of closely related transactions or a sale of all or substantially all of the assets of the Partnership." In short, TAPA §§ 5.9(c) and 6.7 authorized HoldCo to negotiate and complete the Callon sale in its sole discretion and interest if it waited at least two years and conducted an arm's-length transaction.

[¶ 159] However, TAPA § 6.7 provides more deferential standards for HoldCo's drag-along rights. The differences between HoldCo's sole discretion and sole interest standards that do not require a fair market value, and the TAPA Article V standards for those potentially conflicted transactions that do require a fair market value shows that the parties knowingly negotiated for and accepted the risks that § 6.7 created. Thus, they met TBOC § 152.205's minimum standards, and it is undisputed that HoldCo waited roughly five years and the Callon sale was an arm's-length sale.[99]

---

[99] FAP ¶s 2 (referring to "third party" Callon), 42 (TAPA signed July 12, 2016), 94 (Callon sale closed October 1, 2021); Nov. 21, 2024, Hrg. Tr. at 8:2–22, 22:11–25:12, 26:16–27:18.

[¶ 160] So, except as to the sale proceeds' allocation and distribution, HoldCo conclusively met its loyalty duty regarding the Callon sale.

[¶ 161] But HoldCo (and PEC) had to conduct the sale in good faith.

### c. Care and HoldCo's Drag-Along Rights

[¶ 162] In contrast to the loyalty duty, the care duty concerns the conduct or process a partner used while operating the business or deciding whether to do a third-party deal. *See* TBOC § 152.206 (care requires acting without negligence in conducting the partnership's business). That is, the TBOC adopts a form of business judgment rule as its care duty standard. *See id.*; Miller, *Fiduciary Duties* 27.

[¶ 163] Here, the parties' arm's-length sale standard as a matter of law satisfied TBOC § 152.206(a)'s care duty regarding the Callon sale by adopting an alternative minimum sale process procedure. *See Cruz*, 2018 WL 6566642, *14. It is undisputed that the Callon sale was an arm's-length transaction.[100] Thus, HoldCo satisfied its care duty with the Callon sale.

[¶ 164] But, HoldCo still had to discharge that obligation in good faith.

---

[100] FAP ¶s 2 ("third party" Callon), 42 (TAPA signed July 12, 2016), 94 (Callon sale closed October 1, 2021); Nov. 21, 2024, Hrg. Tr. at 8:2–22, 22:11–25:12, 26:16–27:18.

## d. Good Faith

### i. Introduction

[¶ 165] Texas courts have not drawn clear distinctions between the loyalty, care, good faith, and candor responsibilities. *See, e.g.*, *Zinda, Ltd.*, 178 S.W.3d at 890–91 (analyzed duties of full disclosure, candor, and good faith as a single fiduciary duty); *Cruz*, 2018 WL 6566642, *10–11 (combined loyalty and good faith analysis). Nor has the court found Texas cases applying those principles to drag-along sales.

[¶ 166] However, the risks inherent with drag-along rights are well known. *See, e.g.*, Evan Tarver, *What are Drag-Along Rights? Meaning, Benefits, and Example*, Investopedia June 11, 2024, https://www.investopedia.com/terms/d/dragalongrights.asp. Thus, they are typically negotiated at the beginning of a relationship and are recognized as one of the best ways for a majority owner to maintain control over future transactions that may involve minority owners. Soren Lindstrom and Lindsey Reighard, *II. How to Deal with Minority Shareholder Investments*, 2016 TXCLE Advanced Bus. L. 14.II (2016).

[¶ 167] Indeed:

> Drag-Along rights, or drag rights, which give the majority owner the right to force minority owners to participate in a sale

of the company, can be a fiercely negotiated provision in a company's governing documents.

* * *

In negotiating these provisions, the minority owner seeks to ensure that such a sale will not disadvantage the minority. In light of what is at stake and the inherent uncertainty drag rights engender, parties are understandably cautious when approaching the negotiating table.

Robert B. Little & Joseph A. Orien, *Issues and Best Practices in Drafting Drag-Along Provisions*, Harvard Law School Forum on Corporate Governance (2016) (Little and Orien).

[¶ 168] With PEOFs having accepted those risks and HoldCo having met the TAPA's minimized standards, PEOFs rely on good faith-based arguments to support their claims.[101] The court addresses PEOFs' arguments as follows:

### ii. Fair Price and Process

[¶ 169] Many of PEOFs' claims share the core premise that the consideration HoldCo negotiated and the process used to value and negotiate the sale was unfair because the consideration was too low and produced too little return for PEOFs.[102] Central to that premise is the notion that HoldCo

---

[101] *See, e.g.*, FAP ¶s 52, 53, 105; PEOF Resp. at 3–6, 11–20.
[102] *See, e.g.*, FAP ¶s 2, 80–81, 84, 100–103, 107; PEOF Resp. at 8–9, 27–30, 35.

had to conduct different processes and negotiate a fair price for the partnership as a whole, including PEOFs, instead of a price that suited HoldCo as decided in its sole discretion.[103]  Yet HoldCo's freedom to do exactly that is what TAPA §§ 5.9 and 6.7 provide for and what PEOFs agreed to five years earlier when they wanted "Blackstone's" money.

[¶ 170] Nonetheless, PEOFs ask the court to alter the risk allocation equation and imply non-existent § 6.7 fair price and required process terms.[104] But no such terms exist in the TAPA, and imposing them would violate Texas's sacred contract freedom rights.  *See Nafta Traders*, 339 S.W.3d at 95–96. Instead, PEOFs negotiated away those potential protections for "Blackstone's" promised at least two-year capital infusion.[105]

[¶ 171] Furthermore, PEOFs presuppose that HoldCo had to act "in a manner the partner reasonably believes to be in the best interest of the

---

[103] *See, e.g.*, FAP ¶s 85, 92, 99; PEOF Resp. at 28.
[104] *See* PEOF Resp. at 26–30.
[105] TAPA § 6.7.

partnership." *See* TBOC § 152.204(b)(2).[106]  Not so.  As discussed in ¶s 107–09 and 149, the parties disclaimed that obligation.[107]

[¶ 172]  Moreover, as a matter of law HoldCo and PEC did not act in bad faith by exercising their contract rights to discharge HoldCo's drag-along rights as they did.  *E.g.*, *Texas Beef Cattle*, 921 S.W.2d at 211 (Tex. 1996); *John Masek*, 848 S.W.2d at 174.

[¶ 173]  PEOFs' argue that applying the TAPA as written could lead to absurd results such as HoldCo selling the business for a dollar.[108]  The court rejects that argument because, although courts will not enforce unambiguous terms that lead to absurd results, that safety valve is reserved for only truly exceptional cases where it is unthinkable, unfathomable, or quite impossible that a rational person could have intended it.  *Fairfield Indus., Inc. v. EP Energy E&P co., L.P.*, 531 S.W.3d 234, 248–49 (Tex. App.—Houston [14th Dist.] 2017, pet. denied).  Here, the consideration was far greater than a dollar.

---

[106] *See, e.g.*, FAP ¶ 92 ("Blackstone prioritized its own corporate interest … over acting in the best interest of Primexx.").

[107] *See* TAPA §§ 5.9(b)–(c).  PEOFs' reliance on *Houle v. Casillas* for the premise that HoldCo had to consider their interests is misplaced because there was no written agreement in that case excluding that responsibility.  PEOFs' Resp. at 14; *see* 594 S.W.3d at 547.

[108] PEOFs' Resp. at 25.

[¶ 174] Furthermore, it is not the court's role "to question the wisdom of the parties' agreement or to rewrite its provisions under the guise of interpreting it."[109] *Id.* at 242.

[¶ 175] Accordingly, based on the undisputed facts, the parties' business purposes when they signed the TAPA, its unambiguous terms, and TBOC's unambiguous provisions applicable to this case, as a matter of law HoldCo's drag-along rights were not so unthinkable, unfathomable, or impossible that a reasonable person in the parties' positions could not have rationally agreed to their application when they created the TAPA. Indeed, TAPA § 5.9(c)(ii) unambiguously records the parties' agreement that they would not have entered into the TAPA if its terms were not acceptable to them.

[¶ 176] Had these results not been the product of risks PEOFs accepted at the outset, they would have negotiated different standards as they repeatedly did in §§ 5.4–5.8. Or they would have rejected what they deemed to be their best option at the time. But they did none of those things. Accordingly, the court (i) declines to retroactively add diligence standards or

---

[109] *Fairfield* cites *Combs v. Health Care Servs. Corp.*, 401 S.W.3d 623, 630 (Tex. 2013), for support. Although *Combs* is a statutory construction case, the same principles apply here.

a fair price requirement and (ii) and dismisses all PEOFs' claims regarding HoldCo's pre-sale process or negotiated consideration.

### iii.   Information Disclosures

#### [¶ a] Drag-sale Notice Provisions

[¶ 177] The nature of HoldCo's disclosure and good faith responsibilities requires blending common law and statutory principles with contract terms.[110]

[¶ 178] And the amount of notice a majority owner must give the minority owners before invoking drag rights is a common issue parties may address.  Little and Orien.  For example, in *Halpin v. Riverstone Nat'l, Inc.*, the court refused to enforce drag-along rights where the majority owners did not comply with a pre-merger notice requirement.  C.A. No. 9796, 2015 WL 854724, *5–7 (Del. Ch. February 26, 2015).

[¶ 179] Furthermore, the TAPA refers to "notice" over one hundred times.[111]   That is, PEOFs could have negotiated for an advance notice protection as they did elsewhere in the TAPA but did not do so in § 6.7.

---

[110] *See* ¶s 110–28.

[111] *See, e.g.*, TAPA §§ 3.6(b)(v) (in certain circumstances the partnership must give ten days' notice to Series A Preferred Unitholders prior to a liquidation event).

### [¶ b] Voluntary Advance Notice

[¶ 180]  The PEP partnership agreement is silent on whether HoldCo or PEC had to give PEP, PEOFs, or any other partners advance notice regarding the Callon Sale.  For these reasons, the court declines to rewrite the TAPA to include that requirement:

- To begin, as discussed in ¶ 178, advance notice requirements are common with drag-along rights.  Yet, the parties did not include an advance notice requirement.

- Further, given HoldCo's unambiguous authority to conduct the sale in its sole discretion in its sole interests (including its affiliates and PEC's sole discretion and interests), advance notice to PEOFs was not material to that deal.  That is, the Unitholders, and thus a majority of the directors had to follow HoldCo's directions.

[¶ 181]  Accordingly, the court declines to inject notice provisions into § 6.7's drag-along rights that the parties omitted.  *See FPL Energy*, 426 S.W.3d at 68 (Tex. 2014) (omissions intentional where parties negotiated for similar terms elsewhere in the contract).

### iv. Sales Proceeds Allocation and Distribution

[¶ 182] For the reasons the court denies HoldCo's motion regarding whether it breached its loyalty duty regarding the allocation and distribution Callon sale proceeds, HoldCo did not conclusively negate the good faith obligation regarding those claims.

### v. Requested or Misleading Information

[¶ 183] PEOFs do not allege that HoldCo, PEC, or Doyle failed to provide any information PEOFs requested regarding the Callon sale. Thus, TBOC § 152.213's duty to provide requested information is not implicated.

[¶ 184] Similarly, PEOFs do not allege that HoldCo, PEC, or Doyle gave them, or the board false or misleading information regarding the deal. Indeed, those persons could not have provided misleading information to PEOFs if (i) none of those persons communicated with PEOFs and (ii) Jeffs and Langdon were not, as PEOFs posit, their agents on the board. So, the court need not consider whether any such bad faith breach occurred.

### vi. Regular Board Meetings

[¶ 185] PEOFs say that in the weeks and months before the Callon sale, HoldCo failed to hold regularly scheduled board meetings to discuss whether

a sale made sense from the company's or partners' viewpoints.[112] Central to that claim is that there were missed regularly scheduled board meetings. However, PEC's Bylaws do not say when such meetings were to occur.[113] And PEOFs did not respond with evidence on that issue. Since HoldCo submitted evidence that there were no regularly scheduled meetings to be missed, and PEOFs not having submitted contrary evidence, the court grants HoldCo's motion regarding the claim that it failed to hold regularly scheduled PEC board meetings to discuss the Callon sale.

### e. Conclusion

[¶ 186] Excluding PEOFs' claims directed to the allocation and distribution Callon sale proceeds, as a matter of law HoldCo did not breach its duties of loyalty or care or its obligation of good faith in the execution of Callon sale pursuant to its drag right.

## 3. Second Cause of Action: "Fiduciary Breach" (PEC)

[¶ 187] With limited exception, PEOFs' arguments regarding PEC are the same as for HoldCo. Thus, the court's conclusions regarding HoldCo are at least the same as for PEC.

---

[112] FAP ¶ 87.

[113] *See* Movants' Ex. 10 (Bylaws at Art. III).

[¶ 188] Additionally, TAPA § 5.9 provides PEC additional support. For example, § 5.9(b) provides that PEC, as the Managing General Partner,

> . . . shall not owe any fiduciary or similar duty or obligation whatsoever to the Partnership, any Partner or Assignee, except as required by any provision of applicable law that cannot be waived, and

> (B) to the extent that, at law or in equity, the Managing General Partner owes any duties (including fiduciary duties) to the Partnership, any other Partner or assignee pursuant to applicable law, any such duty other than the Agreed Duties is hereby eliminated to the fullest extent permitted pursuant to the applicable law.

[¶ 189] PEOFs argue that PEC breached its responsibilities by participating in the sale because no provisions in the TAPA required PEC to comply with "Blackstone's" drag-along instructions. Although the TAPA does not expressly require PEC to follow HoldCo's direct instructions, PEOFs' argument ignores reality. The reality is that HoldCo controlled PEC's board. And TAPA § 6.7 required all Unitholders to consent to the sale and take all steps needed to complete the sale—including instructing any Existing Limited Partner Directors to approve the drag-along sale. Indeed, PEC had no choice but to do what its directors voted to do, and they all voted to approve the sale and the Transaction Resolutions authorizing PEC's officers to take actions

necessary to complete the sale.[114]  Notably, PEOF appointed directors Jeffs

and Langdon voted for the sale without reservation.[115]

[¶ 190]  Additionally, FAP ¶ 85 concedes that forcing the Callon sale by

using its drag-along rights was under HoldCo's sole control:

> By forcing the Board to vote on (and approve) the proposed
> transaction over a weekend, Blackstone necessarily precluded
> the Managing General Partner or the Board from engaging in a
> reasoned and fully informed decision-making process or
> satisfying their contractual and fiduciary duties.  Yet all
> Blackstone-controlled Board members voted to approve the sale
> without conducting any analysis or due diligence to fairly
> evaluate the transaction and whether it would be fair to all of
> Primexx's investors.

[¶ 191] So, the court resolves PEOFs' Second Cause of Action as it does

their First.

### E.    Third Cause of Action: Breach of Contract (HoldCo)

[¶ 192]  The elements of a contract breach claim are: (i) a valid contract

exists; (ii) the plaintiff performed; (iii) the defendant breached the contract;

and (iv) the plaintiff was damaged as a result.  *E.g.*, *Williams v. First Tenn. Nat.*

---

[114] Movants' Ex. 3 (Aug. 2, 2021, Board Minutes at Ex. A).

[115] Movants' Ex. 3 (August 2, 2021, Board Minutes).  PEOFs deny that they controlled Jeffs and Langdon as of August 2, 2021.  However, PEOFs was entitled to control two seats on the board.  Whether PEOFs chose to abandon that right is not material to this motion because board approval was a non-discretionary function since all Unitholders had to cooperate in closing the deal, including the § 6.7 requirement that they direct their appointed directors to approve the deal.  And HoldCo controlled five of nine seats.

*Corp.*, 97 S.W.3d 798, 802 (Tex. App.—Dallas, 2003, no pet). Here, the third element is the only one before the court.

[¶ 193] It is undisputed that HoldCo waited the required two years and it conducted the Callon deal in an arm's-length sale.[116] Nonetheless, PEOFs' Third Cause of Action posits that HoldCo breached the TAPA based on the same alleged good faith breaches they say support their First Cause of Action.

[¶ 194] Because HoldCo's "fiduciary" duties required it to perform in good faith, its contract duty to perform in good faith is no greater than its TBOC-based responsibilities. Accordingly, the court resolves PEOFs' Third Cause of Action same as it disposes of their First.

## F. Fourth, Fifth, Sixth, Seventh, and Eighth Causes of Action: Derivative Liability Causes of Action (Holdco, PEC, and Doyle)

### 1. Introduction

[¶ 195] PEOFs' Fourth, Fifth, Sixth, Seventh, and Eighth Causes of Action assert civil conspiracy, aiding and abetting fiduciary breach, and knowing participation in fiduciary breach causes of action against Holdco, PEC, and Doyle.[117] These are derivative liability torts because they involve a

---

[116] FAP ¶s 2 (referring to "third party" Callon), 42 (TAPA signed July 12, 2016), 94 (Callon sale closed October 1, 2021); Nov. 21, 2024, Hrg. Tr. at 8:2–22, 22:11–25:12, 26:16–27:18.

[117] FAP ¶s 136–154.

defendant's participation in another person's torts where the defendant otherwise would not be liable for the tort. *See Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 140–42 (Tex. 2019) (civil conspiracy a vicarious—not direct—liability tort); *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 930 (Tex. 2010) (aiding abetting claim failed for same reason civil conspiracy failed, but noted that the Texas Supreme Court has not recognized an independent aiding and abetting claim); *Kinzbach Tool Co v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 514 (Tex. 1942) (joint and several liability for knowingly participating in agent's fiduciary breach to principal).

### 2. Aiding and Abetting (HoldCo and Doyle)

[¶ 196] Neither the supreme court nor the Fifteenth Court of Appeals have recognized aiding and abetting as a separate liability theory apart from civil conspiracy. *See First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 224 (Tex. 2017); *Palliative Plus LLC v. A Assure Hospice, Inc.*, No. 03-23-00770-CV, 2025 WL 284920, *10 (Tex. App.—Beaumont January 24, 2025, no pet. h.). So, subject to those courts later recognizing this theory, the court dismisses PEOFs' aiding and abetting cause of action against Holdco and Doyle. *See* TEX. R. CIV. P. 166(g), (p).

### 3. Civil Conspiracy and Knowing Participation (Holdco, PEC, and Doyle)

[¶ 197] PEOFs' civil conspiracy and *Kinzbach* claims depend on the viability of their fiduciary breach claims. Thus, at a minimum, the court's rulings regarding PEOFs' fiduciary breach claims apply equally to these causes of action; and the court incorporates those prior rulings here.

[¶ 198] The following discussion concerns issues that movants' motions implicate but that the parties did not previously discuss. So, the court does not rule on them now. However, pursuant to Rules 166(g), (p) the court directs the parties to brief these issues:

- To what extent were PEC or Doyle legally capable of the civil conspiracies alleged against them (consider the various combinations alleged against them)?

- Is knowing participation in a fiduciary breach a viable cause of action where HoldCo controlled the Board, the Unitholders, and Doyle regarding the Callon sale?

[¶ 199] For causes of action concerning them, PEC and Doyle are to submit their briefs within ten days of this opinion's signature date. PEOFs are to submit their responses, if any, within ten days of the later submission by

PEC or Doyle.  The briefs are to be no more than ten pages excluding the style, caption, and preliminary tables.

## VII. CONCLUSION

[¶ 200] Accordingly, the court denies movants' motion regarding causes of action asserted against them based on claims that (i) the Callon sale proceeds were not properly distributed according to the TAPA waterfall and (ii) the consideration was not fairly allocated between PEP and BPP. Otherwise, the court grants movants' motion and dismisses the causes of action against them as described above.

It is, SO ORDERED.

_____
BILL WHITEHILL
Judge, Texas Business Court-
First Division

SIGNED:  March 10, 2025

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 98269421
Filing Code Description: No Fee Documents
Filing Description: Opinion on Motion for Summary Judgment
Status as of 3/10/2025 3:51 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Christopher W.Patton | | cpatton@lynnllp.com | 3/10/2025 2:35:27 PM | SENT |
| Scott Smoot | | ssmoot@lynnllp.com | 3/10/2025 2:35:27 PM | SENT |
| Stephen Shackelford | | sshackelford@susmangodfrey.com | 3/10/2025 2:35:27 PM | SENT |
| NATALIE STALLBOHM | | nstallbohm@lynnllp.com | 3/10/2025 2:35:27 PM | SENT |
| M. TaylorLevesque | | taylor.levesque@troutman.com | 3/10/2025 2:35:27 PM | SENT |
| Sarah Hannigan | | shannigan@susmangodfrey.com | 3/10/2025 2:35:27 PM | SENT |
| Gary Vogt | | gvogt@kirkland.com | 3/10/2025 2:35:27 PM | SENT |
| Bryan Caforio | | bcaforio@susmangodfrey.com | 3/10/2025 2:35:27 PM | SENT |
| Michelle Williams | | mwilliams@susmangodfrey.com | 3/10/2025 2:35:27 PM | SENT |
| Kerri Jones | | kjones@lynnllp.com | 3/10/2025 2:35:27 PM | SENT |
| Gina Flores | | gflores@lynnllp.com | 3/10/2025 2:35:27 PM | SENT |
| Roger BCowie | | Roger.Cowie@troutman.com | 3/10/2025 2:35:27 PM | SENT |
| Jeremy Fielding | | jeremy.fielding@kirkland.com | 3/10/2025 2:35:27 PM | SENT |
| Zack Ewing | | zack.ewing@kirkland.com | 3/10/2025 2:35:27 PM | SENT |
| Nicholas Perrone | | nicholas.perrone@kirkland.com | 3/10/2025 2:35:27 PM | SENT |
| Josephine Wang | | jwang@susmangodfrey.com | 3/10/2025 2:35:27 PM | SENT |
| Lindsey Godfrey Eccles | | leccles@susmangodfrey.com | 3/10/2025 2:35:27 PM | SENT |
| Michael Patton | | michael.patton@kirkland.com | 3/10/2025 2:35:27 PM | SENT |
| Laura QuinnBrigham | | laura.brigham@kirkland.com | 3/10/2025 2:35:27 PM | SENT |
| Christopher Schwegmann | | cschwegmann@lynnllp.com | 3/10/2025 2:35:27 PM | SENT |
| Yaman Desai | | ydesai@lynnllp.com | 3/10/2025 2:35:27 PM | SENT |
| Kyle Gardner | | kgardner@lynnllp.com | 3/10/2025 2:35:27 PM | SENT |

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 98269421
Filing Code Description: No Fee Documents
Filing Description: Opinion on Motion for Summary Judgment
Status as of 3/10/2025 3:51 PM CST

Case Contacts

| Kyle Gardner | | kgardner@lynnllp.com | 3/10/2025 2:35:27 PM | SENT |
|---|---|---|---|---|
| Louisa Karam | | louisa.karam@lockelord.com | 3/10/2025 2:35:27 PM | SENT |
| Theressa Washington | | Theressa.Washington@lockelord.com | 3/10/2025 2:35:27 PM | SENT |
| Business Court 1B | | BCDivision1B@txcourts.gov | 3/10/2025 2:35:27 PM | SENT |
| Griffin Vail | | griffin.vail@kirkland.com | 3/10/2025 2:35:27 PM | SENT |
| Jessica Cox | | jcox@lynnllp.com | 3/10/2025 2:35:27 PM | SENT |
| Karyn Cooper | | karyn.cooper@kirkland.com | 3/10/2025 2:35:27 PM | ERROR |