2026 Tex. Bus. 18



THE BUSINESS COURT OF TEXAS
ELEVENTH DIVISION

| | | |
|---|---|---|
| ENERGY FOUNDERS FUND, LP, | § | |
| | § | |
| *Plaintiff/Counter-Defendant*, | § | |
| | § | |
| v. | § | |
| | § | |
| PHILLIP DASKEVICH and CRIS | § | |
| CURNUTT DASKEVICH, | § | |
| | § | |
| *Defendants/Counter-Plaintiffs*, | § | |
| | § | Cause No. 26-BC11A-0004 |
| | § | |
| PHILLIP DASKEVICH and CRIS | § | |
| CURNUTT DASKEVICH, both | § | |
| individually, and derivatively on | § | |
| behalf of GAGE WESTERN LLC, | § | |
| | § | |
| *Third-Party Plaintiffs*, | § | |
| | § | |
| v. | § | |
| | § | |
| GAGE WESTERN LLC, et al., | § | |
| | § | |
| *Third-Party Defendants*. | § | |

**MEMORANDUM OPINION AND ORDER ON MOTIONS FOR
SUMMARY JUDGMENT ON INTERPRETATION OF COMPANY AGREEMENT**

## INTRODUCTION

¶ 1.     The Court considers four motions for partial summary judgment, all turning on the same issue of contract interpretation. Plaintiff Energy Founders Fund, LP ("EFF") and Third-Party Defendant John Donovan, Jr.—the Class A Director of Gage Western, LLC (the "Company")—advance one reading of the Company Agreement.[1] Defendants and Third-Party Plaintiffs Phillip Daskevich and Cris Curnutt Daskevich urge the opposite view.[2]

¶ 2.     The dispute is narrow, but consequential. Under Gage Western's Third Amended and Restated Limited Liability Company Agreement (the "Company Agreement"), does a transfer of membership units—including one that would transfer 100% of the Company's equity—require only a majority vote of the Board of Directors ("Board Approval") under Section 9.2? Or does it also require the consent of both the Class A and Class B Directors ("Special Director Approval") under Section 7.2(c)(ii)?

¶ 3.     Because the competing motions rise or fall on the same contractual language, the Court addresses them together. The answer, in the Court's view, is

---

[1] EFF's Motion for Partial Summary Judgment on Interpretation of Company Agreement was filed in the district court on April 14, 2025. Donovan's Motion for Partial Summary Judgment was filed in the district court on October 31, 2025.

[2] The Daskeviches' cross-motions to EFF's and Donovan's motions were filed in the district court on June 10, 2025 and in this Court on March 13, 2026, respectively. Due to overlapping arguments, unless otherwise indicated in this opinion, any citations to the Daskeviches' "cross-motion" are to the cross-motion filed in response to EFF's motion.

straightforward: Section 9.2 requires Board Approval and nothing more. EFF's and Donovan's motions are therefore GRANTED, and the Daskeviches' cross-motions are DENIED.[3]

¶ 4.    The Court notes an important limitation on the scope of this ruling. The parties' briefing largely assumes that the transaction at issue qualifies as a "Controlling Sale" to a non-"Affiliate" under Section 9.2(c)—an issue that will likely determine whether the Agreement's drag-along provisions were properly invoked. Because that issue is the subject of a separate summary-judgment motion that the Court has not yet considered, the Court expresses no view on it here. It remains a question for another day.

## BACKGROUND FACTS

¶ 5.    The relevant facts are undisputed. At the center of the controversy is the Company Agreement dated March 3, 2020, which governs the parties' respective rights and obligations.[4] EFF and the Daskeviches, in their individual capacities, signed the Agreement.[5]

---

[3] The district court held a hearing on EFF's motion and the Daskeviches' respective cross-motion but did not issue a ruling. At a March 3, 2026 case management conference in the Business Court, the parties agreed that all motions carried over from the district court, and the Daskeviches' cross-motion to Donovan's motion, would be decided on written submission.

[4] The Company Agreement is included in the summary-judgment record as Exhibit B to EFF's Motion for Partial Summary Judgment and as Exhibit A to the Daskeviches' cross-motion.

[5] *See* signature pages to Company Agreement.

¶ 6.    The Agreement vests management authority in a three-member Board of Directors consisting of a Class A Director, a Class B Director, and a Management Director.[6] "Board Approval" is defined as the "affirmative approval of a simple majority of the Directors on the Board."[7] Unless otherwise specified, that simple majority vote is the default approval mechanism under the Company Agreement.[8]

¶ 7.    At all relevant times, the Board consisted of John Donovan (Class A Director), Phillip Daskevich (Class B Director), and Jonathan Tauber (Management Director). Each was entitled to one vote.[9]

¶ 8.    EFF and the Daskeviches were significant equity holders. The record reflects that EFF and affiliated Class A members collectively held a majority ownership interest, while the Daskeviches, through their Class B units, held a substantial minority stake.[10]

¶ 9.    Section 9.2 of the Agreement governs transfers of membership units. It provides that "no Member shall Transfer all or any part of such Member's Units without prior Board Approval . . . ."[11] The same section also contains a "drag-along"

---

[6] Company Agreement § 7.1.
[7] *Id*. § 1.8.
[8] *Id.* § 2.3(d); *see also id.* § 7.1(a) ("Any decisions to be made by the Board shall require Board Approval, except as otherwise expressly provided herein.").
[9] *Id*. § 7.1(a).
[10] *Id*. at Schedule 1.
[11] *Id.* § 9.2(a)(i).

provision permitting certain transactions—referred to as "Controlling Sales"—to require other members to sell their units on the same terms.[12]

¶ 10.  On August 7, 2024, EFF initiated a transaction to sell its units to a newly formed entity, GW Allen, LLC ("GW Allen").[13] In its Notice of Transfer, EFF characterized the transaction as a "Controlling Sale," which, if approved, would trigger drag-along rights and require all other members to sell their units on the same terms. In practical effect, this would transfer 100% of the Company's equity.

¶ 11.  On September 3, 2024, the Board voted on the proposed transfer.[14] Donovan and Tauber voted in favor. Daskevich, the Class B Director, voted against the transfer, asserting that the transaction required Special Director Approval under Section 7.2(c)(ii).

¶ 12.  The transaction nevertheless proceeded and closed in November 2024. This dispute followed.

## LEGAL STANDARD

¶ 13.  Summary judgment is governed by Texas Rule of Civil Procedure 166a. A movant "bears the burden to show that no genuine issue of material fact exists and

---

[12] *Id.* § 9.2(c). A "drag-along" provision permits specified equity holders—typically a majority owner—to require other owners to participate in a sale of the company on the same terms. *Primexx Energy Opportunity Fund, LP v. Primexx Energy Corp.*, 2025 Tex. Bus. 9, ¶ 2, 709 S.W.3d 619, 628 (1st Div.). In effect, it allows the majority to "drag along" minority holders so that a third-party buyer can acquire the entire company without needing each individual owner's consent.

[13] Notice of Transfer of Units, Ex. B to Daskeviches' Cross-mot.

[14] Board of Managers Meeting Minutes, Ex. R to EFF's Mot., at 2.

that it is entitled to judgment as a matter of law."[15] The nature of that burden varies by posture. A plaintiff must conclusively establish all essential elements of its claim.[16] A defendant must either conclusively negate at least one element of the plaintiff's claim or prove all elements of an affirmative defense.[17]

¶ 14.   In evaluating whether a fact issue exists, a court takes as true all evidence favorable to the nonmovant, indulges every reasonable inference in the nonmovant's favor, and resolves any doubts against the movant.[18] A court may not weigh the evidence or resolve credibility determinations at this stage; its role is limited to deciding whether a genuine fact issue exists for trial.[19]

¶ 15.   Questions of contract interpretation are often well suited for summary judgment.[20] In construing a contract, the Court's objective is to ascertain and give effect to the parties' intent as expressed in the agreement itself.[21] To do so, the Court considers the contract as a whole, harmonizing and giving effect to all provisions so that none are rendered meaningless.[22]

---

[15] *ConocoPhillips Co. v. Koopmann*, 547 S.W.3d 858, 865 (Tex. 2018) (citing TEX. R. CIV. P. 166a(c)).

[16] *See MMP, Ltd. v. Jones*, 710 S.W.2d 59, 60 (Tex. 1986) (per curiam).

[17] *Stanfield v. Neubaum*, 494 S.W.3d 90, 96 (Tex. 2016).

[18] *ConocoPhillips*, 547 S.W.3d at 865.

[19] *Huckabee v. Time Warner Ent. Co. L.P.*, 19 S.W.3d 413, 422–23 (Tex. 2000); *see also Ortega v. Pean*, No. 01-18-00249-CV, 2019 WL 1560859, at *10 (Tex. App.—Houston [1st Dist.] Apr. 11, 2019, pet. denied) (mem. op.) ("[I]f a summary judgment motion involves the credibility of affiants, or the weight to be given to evidence, the motion should not be granted." (internal quotation marks omitted)).

[20]  *See Hallmark v. Port/Cooper-T. Smith Stevedoring Co.*, 907 S.W.2d 586, 590 (Tex. App.—Corpus Christi-Edinburg 1995, no writ); *Tellepsen Builders, L.P. v. Kendall/Heaton Assocs., Inc.*, 325 S.W.3d 692, 696 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

[21] *Italian Cowboy Partners v. Prudential Ins.*, 341 S.W.3d 323, 333 (Tex. 2011); *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003).

[22] *Italian Cowboy*, 341 S.W.3d at 333.

¶ 16. This analysis begins—and ideally ends—with the contract's plain language.[23] If the language is susceptible to a definite or certain legal interpretation, then it is unambiguous and must be enforced as written.[24] If, on the other hand, the contract is susceptible to more than one reasonable interpretation, it is ambiguous.[25] Only in that circumstance may the court consider extraneous evidence "to determine the true meaning of the instrument."[26]

¶ 17. These principles apply equally to limited liability company agreements.[27] Such agreements govern an LLC's internal affairs and may include "any provisions for the regulation and management" of the LLC's affairs that are not inconsistent with law.[28] The Court construes such agreements as a whole and gives their terms their plain, ordinary, and accepted meanings unless the agreement itself indicates a different or technical usage.[29] When the provisions of a company agreement are unambiguous, a court must enforce them as written.[30]

## ANALYSIS

### A. Section 9.2 governs transfers and requires only Board Approval

---

[23] *Id.* (citing *Progressive Cnty Mut. Ins. Co. v. Kelley,* 284 S.W.3d 805, 807 (Tex. 2009) (per curiam)).

[24] *J.M. Davidson*, 128 S.W.3d at 229.

[25] *Italian Cowboy*, 341 S.W.3d at 333 (citing *J.M. Davidson*, 128 S.W.3d at 229).

[26] *Id.* at 333–34 (quoting *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450–51 (Tex. 2008) (per curiam)).

[27] *Bay Area RV Parks, L.L.C. v. WGB RV Parks, LLC*, No. 01-21-00085-CV, 2023 WL 2248738, at *6 (Tex. App.—Houston [1st Dist.] Feb. 28, 2023, pet. denied) (mem. op.) (citing *Abdullatif v. Choudhri*, 561 S.W.3d 590, 609–10 (Tex. App.—Houston [14th Dist.] 2018, pet. denied)).

[28] TEX. BUS. ORGS. CODE § 101.052(a), (d); *Bay Area RV Parks, L.L.C.*, 2023 WL 2248738, at *6.

[29] *See Bay Area RV Parks, L.L.C.*, 2023 WL 2248738, at *6 (citing *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 764 (Tex. 2018)).

[30] *See id.*

¶ 18. The parties agree on one point: Section 9.2 governs transfers of membership units. They part ways on what that provision requires.

¶ 19. EFF and Donovan read Section 9.2 as self-contained. In their view, the analysis begins and ends with the plain text: transfers require "Board Approval," defined as a simple majority vote.[31]

¶ 20. The Daskeviches see more. They do not dispute that Section 9.2 requires Board Approval. Their position is that Section 7.2(c)(ii) adds a second requirement—namely, that any "material agreement" involving a member also requires approval by both the Class A and Class B Directors. Because a Controlling Sale is necessarily implemented through a purchase agreement involving a member, they contend that both provisions apply, creating a dual-approval regime.[32]

¶ 21. The question, then, is not whether Section 9.2 applies—it does. Rather, the question is whether Section 7.2(c)(ii) also applies and adds a second layer of approval. The Court concludes it does not.

¶ 22. The starting point is the transfer provision itself. Section 9.2 provides that a member may not transfer its units without "Board Approval." The Agreement defines "Board Approval" as the "affirmative approval of a simple majority of the

[31] EFF's Mot. ¶¶ 11–14; Donovan's Mot. ¶¶ 14–19.
[32] Daskeviches' Cross-mot. ¶¶ 4, 24–26, 28.

Directors of the Board." That is the complete rule. It identifies the subject (transfers), the decisionmaker (the Board), and the voting standard (majority vote).

¶ 23.  It is also the only rule the parties wrote for transfers. Article 9 is called, plainly enough, "Transfers." And nowhere in Article 9 does it cross-reference or mention Section 7.2. Nor does it distinguish between routine transfers and large or transformative ones, or carve out special approval rights for particular directors. Those omissions matter. When parties intend layered approval rights, they say so.

¶ 24.  When a contract speaks directly to the issue in dispute, the Court's task is not to improve it, but to enforce it.[33]

¶ 25.  The Daskeviches emphasize that the sale to GW Allen was no ordinary transfer—it was a "Controlling Sale" that swept the entire Company into a single transaction. That is true, but beside the point. The Agreement itself places "Controlling Sales" within Section 9.2. This same section also contains the "tag along" and "drag along" provisions for transfers. The parties thus chose to treat even the most consequential, drag-along transactions as "transfers" subject to the same approval mechanism.

---

[33] *See URI*, 543 S.W.3d at 767 (recognizing that courts have responsibility to "honor the parties' agreement without altering it" (internal quotation marks omitted)); *BlueStone Nat. Res. II, LLC v. Randle*, 620 S.W.3d 380, 387 (Tex. 2021) ("An unambiguous contract—one whose meaning is certain and definite—will be enforced as written.").

¶ 26.  The Court declines to create a second, unwritten approval regime for "important" transfers. The Agreement already supplies the applicable standard, and that standard is Board Approval.

**B.      Section 7.2(c)(ii) does not apply to member transfers**

¶ 27.  The Daskeviches' argument ultimately rests on applying Section 7.2(c)(ii) to the transfer analysis. That provision requires "Special Director Approval" before the Company may enter into any "material agreement[s]" with a member. The relevant language states:

> Notwithstanding any other provision of this Agreement, the Company or any of its Subsidiaries shall not do (or consent to) any of the following, either directly or indirectly . . . without the approval of the Class A Director and the Class B Director: . . . (ii) amend or enter into any material agreement to which any Member or its Affiliate is a party . . . .[34]

¶ 28.  The Daskeviches argue that because the challenged transfer involved a material agreement to which a member was a party, Section 7.2(c)(ii) imposed an additional requirement of approval by both the Class A Director and the Class B Director.[35]

¶ 29.  The difficulty with the Daskeviches' position is that Section 7.2(c)(ii), by its own terms, regulates actions taken by "the Company or any of its Subsidiaries." Section 9.2, by contrast, governs when a "Member shall Transfer"

---

[34] Company Agreement § 7.2(c)(ii).
[35] Daskeviches' Cross-mot. ¶ 28.

units.[36] The Agreement thus draws a clear line between *Company* actions in Section 7.2 and *member* transfers in Section 9.2—and assigns different approval regimes to each. Different actors. Different conduct. Different rules.

¶ 30.  This distinction is dispositive. The Agreement is organized by subject matter. Article 7 addresses how the Company acts; Article 9 addresses how members transfer their interests. The transaction at issue fits comfortably within Article 9. The Company is neither the buyer nor seller of EFF's units and therefore has taken no action within the meaning of Section 7.2.

¶ 31.  The Daskeviches' interpretation would collapse that distinction. Under their reading, *every* transfer would also be a "material agreement" involving a member—because every transfer is implemented through a purchase agreement involving a member.[37] But if Section 7.2(c)(ii) applied in every instance, it would render Section 9.2 meaningless.[38] There would be little reason to specify in Section 9.2 that transfers require only a simple majority of the Board if Special Director Approval is always required under Section 7.2.  After all, the Class A and Class B

---

[36] "Transfer" means "any direct or indirect sale, assignment, conveyance, pledge, encumbrance or mortgage by a Member or its successor of all or any portion of such Member's or successor's Units, whether occurring voluntarily or by operation of law." Company Agreement § 1.8. Definitionally, Transfers are acts taken by the Members, not by the Company.

[37] *See* Daskeviches' Reply at 3 ("EFF's narrow distinction between 'member-level' and 'company-level' transactions ignores that any transfer under Article 9, including a Controlling Sale, necessarily involves formal Company action. . . . This required Company action—approving or rejecting the proposed transfer and issuing such resolution—constitutes explicit corporate consent and triggers Section 7.2(c)(ii).").

[38] *See Bd. of Regents of Univ. of Texas Sys. v. IDEXX Lab'ys, Inc.*, 691 S.W.3d 438, 447 (Tex. 2024) (emphasizing that contracts must be read to give "operative significance" to all the provisions and ensure "[e]ach . . . does independent work" (alteration in original) (quoting *Pulsifer v. United States*, 601 U.S. 124, 141–42 (2024))).

Director votes needed for Special Director Approval would be a simple majority every time, so the parties could have just said in Section 9.2 that Special Board Approval is required for all transfers. They did not.

¶ 32. Contracts are not read that way. Courts must give effect to every provision—not to let one swallow another. The only reading that preserves both provisions is the straightforward one: Section 9.2 governs transfers, while Section 7.2(c)(ii) governs Company actions. Each operates in its own lanes.

## C.  The structure of the Company Agreement confirms that transfers require only Board Approval

¶ 33. At bottom, the Daskeviches' argument sounds in fairness. They emphasize their status as minority owners, point to the practical consequences of the transaction, and warn that EFF's reading leaves minority members exposed in a drag-along sale.[39] Those concerns are understandable, but they do not alter the Court's analysis. The Court's task is not to rewrite the contract to achieve the most equitable outcome, but to enforce the bargain the parties made.

¶ 34. And the Agreement does provide protections—just not a veto over transfers.

¶ 35. Article 9 reflects a deliberate structure. It addresses both (i) how transfers are approved and (ii) how fairness among members is preserved when

---

[39] *See* Daskeviches' Cross-mot. ¶¶ 6, 27, 32.

transfers occur. Section 9.2(a)(i) supplies the approval rule—Board Approval. Section 9.2(a)(ii) addresses how other members are protected when a transfer is proposed.

¶ 36. The centerpiece of that protection is the Right of First Offer ("ROFO").[40] It gives existing members the right to match a proposed sale before units may be transferred to a third party.[41] In practical terms, it allows minority members to block a sale at an unacceptable price by stepping into the deal themselves. The Agreement goes even further: its drag-along provisions do not apply "unless the bona fide third party offer exceeds the amount of any offers submitted by the other Members pursuant to Section 9.2(a)(ii)."[42] In other words, the ROFO sets a floor for an acceptable price in a third-party transfer.

¶ 37. This is no small protection. While it is true the ROFO does not empower a minority holder to block a sale outright, it does address the central risk inherent in any drag-along sale—the possibility of being forced out at an unfair valuation. That is the protection the parties bargained for.

---

[40] Company Agreement § 9.2(a)(ii), (c).
[41] *See* Soren Lindstrom & Lindsey Reighard, *How to Protect Yourself as a Minority Shareholder*, *in* State Bar of Tex., 14th Annual Advanced Bus. L. Course (2016) ("Pre-emptive rights (also commonly known as rights of first offer) entitle minority shareholders to purchase their pro rata share or more of future equity issuances . . . by the company, subject to customary exceptions. . . . Any ownership interests subject to preemptive rights that are not purchased by the minority shareholder typically may be issued within a specified period of time (e.g., 90 days) to another person on and subject to substantially the same terms and conditions and at the same price as those offered to the minority shareholders.").
[42] Company Agreement § 9.2(c).

¶ 38.  That is also the process that played out here. In its Notice of Transfer dated August 7, 2024, EFF announced it had agreed to sell its member units for $4.5 million.[43] The Notice referred to the "ROFO Opportunity" for other members and stated that EFF would exercise its drag-along rights only if "the Bona Fide Offer exceeds the amount of any offers submitted by a Minority Member through its ROFO Opportunity . . . ."[44] A month later, the Board Minutes for September 3, 2024 reflect that Phillip Daskevich "acknowledges that the date that the ROFO expires is November 10 . . . ."[45]

¶ 39.  That sequence is how the Agreement is designed to operate. If the parties had intended to give the Class B Director a veto over transfers, they could have said so in Section 9.2. Instead, they paired a majority-approval rule with an economic backstop in the ROFO. The Court, absent express language in the Company Agreement, will not convert that backstop into a veto.

**D.     Section 7.4(d) does not change the analysis**

¶ 40.  The Daskeviches also rely on Section 7.4(d), which addresses quorum and voting procedures.[46] That provision states, in substance, that *when* Section 7.2 applies, its requirements cannot be bypassed through Board mechanics.[47]

---

[43] Notice of Transfer of Units.
[44] *Id.*
[45] Board of Managers Meeting Minutes at 1.
[46] Daskeviches' Cross-mot. ¶¶ 29–31.
[47] *See* Company Agreement § 7.4(d).

¶ 41.   But that is all that provision does. Section 7.4(d) does not expand the universe of actions to which Section 7.2 applies; it simply preserves such requirements where they otherwise exist. The Daskeviches acknowledge this in their briefing: "Section 7.4(d) confirms that ordinary Board Approval is still insufficient *if* Section 7.2 is applicable."[48]

¶ 42.   Because Section 7.2(c)(ii) does not apply to member transfers, Section 7.4(d) has no operative effect.

**E.      The "notwithstanding" clause does not alter the result**

¶ 43.   Finally, the Daskeviches invoke the "notwithstanding any other provision" clause in Section 7.2(c)(ii).[49] That clause gives priority to Section 7.2(c)(ii) in the event of a conflict.[50] In the Daskeviches' view, this means the provisions of Section 7.2 must control over Section 9.2.

¶ 44.   The flaw in that reasoning is that there is no conflict. As discussed, Section 9.2 and Section 7.2 address different actors and different conduct. Those provisions can readily coexist without conflict, leaving no work for the "notwithstanding" clause to do.

---

[48] Daskeviches' Reply in Supp. of Cross-mot. (to Donovan's Mot.) ¶ 15 (emphasis added).
[49] Daskeviches' Cross-mot. ¶¶ 24–25.
[50] Company Agreement § 7.2(c)(ii) ("Notwithstanding any other provision of this Agreement, the Company or any of its Subsidiaries shall not do (or consent to) any of the following, either directly or indirectly . . . at any time, without the approval of the Class A Director and the Class B Director . . . amend or enter into any material agreement to which any Member or its Affiliate is a party . . . .").

**DISPOSITION**

¶ 45. Because the Company Agreement unambiguously provides that transfers under Section 9.2 require Board Approval, and because Board Approval means approval by a simple majority of the Board, the September 3, 2024 vote was valid and effective under the Agreement.

¶ 46. It is therefore **ORDERED** that the Motion for Partial Summary Judgment filed by Plaintiff Energy Founders Fund, LP and the Motion for Partial Summary Judgment filed by John Donovan, Jr. are **GRANTED**.

¶ 47. It is further **ORDERED** that:

   a) Under Section 9.2 of the Company Agreement, a transfer of units requires Board Approval.

   b) Under the Company Agreement, "Board Approval" means approval by a simple majority of the Board of Directors.

   c) Section 7.2(c)(ii) of the Company Agreement does not require separate approval by both the Class A Director and the Class B Director for a transfer governed by Section 9.2.

   d) The September 3, 2024 approval of EFF's transfer by a majority of the Board was valid and effective under the Company Agreement.

¶ 48. It is further **ORDERED** that the Daskeviches' Cross-Motions for Partial Summary Judgment are **DENIED**.

IT IS SO ORDERED.

_____
BRIAN STAGNER
Judge of the Texas Business Court,
Eleventh Division, sitting by
assignment


DATED: April 10, 2026